TERESA BENAVIDES ET AL. v. A. C. HUNT, TRUSTEE, ETC.

No. 2916.

1. **Lease of Mining Rights.**—A contract granting the right to mine coal or other minerals on land described for a term of years conveys to the lessee an interest in the land so described.

2. **Same—Limitation.**—Article 3207, Revised Statutes, provides: "Every action other than for the recovery of real estate for which no limitation is otherwise prescribed shall be brought within four years next after the right to bring the same shall have accrued, and not afterwards." This does not apply to an action by a lessee of the right to mine, etc., to recover possession when the owners had unlawfully entered and had taken possession.

3. **Conditions Subsequent — Waiver.** — A grantor entitled to re-enter or forfeit an estate on breach of condition, who does not exercise this right when facts within his knowledge occur that would entitle him to do so, has waived his right. He is estopped from exercising it in all cases in which after breach of condition he permits the grantee without objection to prosecute the enterprise and expend large sums of money in so doing which must be lost to the grantee if a forfeiture be subsequently allowed. See facts held a waiver

4. **Condition "to Use all Economy."** — Right to forfeit estates vested can not exist by reason of the existence or nonexistence of a state of facts not clearly defined. The condition that in the business for which the lease was made the lessee was to "use all economy in the conduct and management of said mining enterprise" is too uncertain to be recognized as a ground on which a forfeiture might rest.

5. **Abandonment.**—That the lessee of the right to mine, etc., placed a person who was at the same time a receiver of a railroad in charge of the mining operations for a time would have been no more a reason for forfeiting the lease than if he had placed it in the hands of any other person in good faith.

6. **Same.**—Ceasing active operations for a time on account of the low price of coal and consequent loss until more favorable conditions would be no abandonment or ground for forfeiting the lease.

7. **Same—Ground of Forfeiture.**—Although there was no express agreement or requirement that the lessee should operate the mine, the subject of the lease, if on development it was found to contain coal which could profitably be worked, yet there was an implied agreement to that effect, and a substantial failure in this respect ought to be held ground of forfeiture.

8. **Reasonable Time.**—Cessation of active work upon the mining operations under a lease for mining purposes was shown, and a re-entry by the lessors claiming a forfeiture. It was a question for the jury whether the cessation was unreasonably long. But the facts would not warrant a verdict that it was. See facts. A temporary cessation of work is no ground for forfeiture of such a mining lease.

9. **Demand Before Forfeiture.**— If cessation for a time actively to use property granted on consideration that it shall be used for a named purpose be not such as to indicate clearly an intention to abandon an enterprise such as the parties in this case were engaged in, then it would seem that before the lessor should be heard to claim a forfeiture he should show a demand that the lessee go forward with the enterprise, and a failure to do so, before his right to a forfeiture would exist under a contract such as appears in this case.

10. **Same — Temporary Cessation.** — In cases such as this no forfeiture should be allowed for temporary cessation to promote actively the enterprise if it be shown that such cessation was beneficial to all parties, unless the terms of the contract be imperative.

11. **Abandonment — Charge.** — With reference to the cessation of active opera-

tions in the mining business and the allegation of abandonment, the court charged the jury as to what would constitute it. The charge was objected .to only because not applicable to the relations of the parties under the lease contract. *Held*, that such relations could not alter the meaning of the term abandonment, although the relation may have imposed duties and given rights which would have no existence between strangers.

Appeal from Webb.  Tried below before Hon. J. C. Russell.
The opinion gives a full statement..

*Atlee & Earnest*, for appellants.— 1. The estate which vested in Hunt as trustee on or before May 15, 1881, was subject to be defeated before the expiration of the full term of fifty years mentioned in the lease by failure of Hunt as trustee to comply with the "terms and conditions" expressed in the lease; and the same being conditions subsequent annexed to such estate, the question of a breach thereof should have been submitted to the jury under the evidence, with proper instructions.  Jeffery v. Graham, 61 Texas, 481; Berryman v. Schumacher, 67 Texas, 312; Cross v. Carson, 44 Am. Dec., 742 (notes), 743–759; Jackson v. Brownell, 3 Am. Dec., 326; Sperry's Lessee v. Pond, 24 Am. Dec., 296; Adams v. Copper Co., 7 Fed. Rep., 634; 2 Washb. Real Prop., 4 ed., secs. 1–5; 13 Am. and Eng. Encyc. of Law, pp. 773–786.

2. The contract of lease contemplated the continuous operation of a mining enterprise.  Ceasing to operate the mines and failure to resume operations within a reasonable time thereafter would forfeit the estate of the lessees, for which the owners might enter.  The jury should have been so instructed.

3. If conditions subsequent are expressed in the lease, a breach of such conditions entitles the lessors to a forfeiture.  An entry after breach of such conditions determines the estate of the lessee.  The lessor, if in possession at the time of such breach, is presumed to be in possession to enforce a forfeiture.  The estate of Hunt was determined on breach of the conditions subsequent, and the lessors became at once revested with the original estate.  The jury should have been so instructed.  Sperry's Lessee v. Pond, 24 Am. Dec., 296; Adams v. Copper Co., 7 Fed. Rep., 634; 3 Washb. Real Prop., secs. 10, 12, 13, 15, 16, 17, 21, 22, 23.

4. A charge correct as an abstract proposition should not be given where it is not applicable to the facts proved, and the probable effect of such a charge is to draw the minds of the jury away from the controlling question arising on the facts.  The law as to rights of parties arising upon breach of conditions subsequent should have been given in the charge.

*Nicholson & Dodd*, and *A. Winslow*, for appellees.— 1. The contract sued upon having no clause in it giving lessors the right of re-entry, nor any clause of forfeiture, the form of the judgment is immaterial, as it de-

prives appellants of no right they might have upon the contract for a breach thereof.

2.    The legal effect of the contract declared upon by appellees was to vest in them the exclusive right to mine coal upon the tract of land described in appellees' petition for the full period of fifty years from the 15th day of May, 1881.    67 Texas, 342; 44 Am. Dec., 742.

3.    The mere fact that the contract obligates the vendors or lessees to do certain things does not operate to make it a conditional contract, or a contract with conditions subsequent, the failure of which would work a forfeiture and authorize an entry and ouster of the vendees or lessees. Taylor v. Sutton, 60 Am. Dec., 686; Pownal v. Taylor, 34 Am. Dec., 729.

4.    The charge complained of as error, when considered in connection with the whole charge, is not erroneous, but is a correct construction of the contract sued upon.    Poitevent v. Hancock County, 58 Miss., 810; Judson v. Malloy, 40 Cal., 299; 2 Washb. Real Prop., 4 ed., 370; Osgood v. Abbott, 58 Me., 73.


STAYTON, CHIEF JUSTICE. — This suit was brought by A. C. Hunt for himself and other plaintiffs, beneficiaries under a contract to be hereafter set out, to recover possession of the mines named in that contract and to enforce such rights as they may have thereunder.

The contract of lease was set out in full by the plaintiffs and is substantially as follows:

"Articles of agreement entered into this 25th day of May, A. D. 1881, between C. M. Macdonell and Teresa Pisana Benavides, of the city of Laredo, county of Webb, and State of Texas, of the first part, and A. C. Hunt, trustee, of the second part, witnesseth:

"The parties of the first part hereby let, lease, and donate unto the parties of the second part the right to mine coal or other minerals on all that tract of land in the county of Webb, State of Texas, known as the Santo Tomas Ranch, fronting on the Rio Grande, between El Arroyo Santo Tomas and El Arroyo de la Llave, with a depth of six leagues, reserving to themselves the use of the land for grazing or farming; to have and to hold the above described mining rights unto the parties of the second part for the full term and period of fifty years, upon the following terms and conditions, to-wit:

"1.    The said second parties promise and agree to furnish all the material, tools, implements, machinery, capital, and labor requisite and necessary for the working and development of any coal mine or mines that may be found on said land.

"2.    The second parties to have the exclusive privilege to mine coal or other minerals on said land during the continuance of said terms, to have the privilege of taking sufficient wood, timber, rock, or any other material on said land for the purpose of said mining enterprise, and to

have the right to erect and put up all necessary buildings or structures for carrying on the business of said mining enterprise; and in case said mining enterprise should not be successful the second parties shall have the right to remove all engines, tools, machinery, buildings, and other fixtures.

"3.    The first parties shall be owners of a one-third part of said mining enterprise, and shall receive one-third of the net profits realized therefrom in the following proportions, that is to say, the said C. M. Macdonell is to have and receive three-fifths of said one-third and Teresa Pisana Benavides two-fifths of said one-third.

"4.    One-fourth of the profits so accruing to the parties of the first part shall be applied to the payment of one-third of the capital invested in said mining enterprise by the parties of the second part and the remaining three-fourths shall be paid over to the first parties as dividends or gains.

"5.    The second parties shall have the exclusive control, management, and direction of said mining enterprise.

"6.    The first parties shall be allowed at all reasonable hours to inspect the books and accounts of said mining enterprise.

"7.    An account shall be taken and dividends or losses declared every six months after the commencement of operation.

"8.    Interest shall not be charged against the first parties on their one-third unpaid capital, nor shall they be liable for any losses.

"9.    The second parties shall begin in good faith the execution and performance of their agreement on or before the 15th day of May, A. D. 1881.

"10.    This agreement shall be in force from and after the 15th day of May, A. D. 1881.    Upon a dissolution of said mining enterprise the first parties shall be entitled to receive a pro rata share of the capital paid in by them.    Said second parties obligate themselves to use all economy in the conduct and management of said mining enterprise.

                              "C. M. Macdonell,
                              "Teresa Pisana de Benavides,
                              "Alex. C. Hunt."

The evidence shows that Hunt in good faith began developing the mine within the time prescribed by the contract, and that this he continued actively until some time in April, 1884, during which time he had expended for this purpose as much as $50,000, no part of which was furnished by the defendants.

The mine was situated some distance from any railway, Laredo being perhaps the nearest point at which a railway could be reached.    Coal was found and worked, but for want of other or cheaper transportation it was conveyed to Laredo for some time in wagons, but the cost was such that coal was sold at a loss.

Prior to April, 1884, a railway had been constructed from Laredo to the coal mines, and this seems to have been done through the exertion and influence of Hunt, who was connected with it; but there seems to have been between the mining and railway enterprises no other relation than such as exists between a common carrier and those who furnish freight.

In April, 1884, from some cause active work in the mine ceased, but the evidence tends to show that from that time until defendants took possession of the mine some work was done and the mine in possession of and cared for by persons in the employment of Hunt.

It does appear, however, that at some time prior to September 22, 1884, the railway running from Laredo to the mines was placed in the hands of a receiver, who for some reason unexplained assumed the right to control the mine.

Hunt seems to have had knowledge of this, but .whether the receiver was acting under authority from him or for him, or assuming such charge on the belief that the receivership extended to the mine as well as the railway, is not shown.

It does appear, however, that there was a person in charge of the mine and keeping it in order who was employed by Hunt for that purpose, but that without the consent of Hunt or the person left by him in charge of the mine, on September 22, 1884, a person acting for and under authority of C. M. Macdonell and Mrs. Benavides took possession of the mine and has since held and operated it, and refused to surrender possession to Hunt or any person for him, though demand has been frequently made from the time appellants took possession.

The evidence shows with reasonable certainty that books were kept by Hunt or under his authority, and does not show that opportunity to inspect them was ever refused either to Macdonell or Mrs. Benavides, though it does appear that one Mowry, as agent of Mrs. Benavides, desired to see the books and did not succeed. His evidence, as set out in brief for appellants, is as follows:

"Am one of the defendants. Mrs. Benavides, defendant, is my wife's mother. I have acted as agent for her since latter part of 1881. . I never saw a statement from Governor Hunt declaring losses or dividends from the working of these coal mines. Never received such statement either for her or myself. I never saw the books kept relating to the transactions of these coal mines. I tried to see them. We called on Governor Hunt several different times, and also on Hungerford, for the privilege of examining the books, and were referred to the Mexican National Railway Company. We called there several times, but did not get to see any books or papers. During the three years in which Hunt had possession of the mines, from 1881 to April, 1884, no statement relating to the business transactions showing losses or gains was ever prepared or presented to us in any way, shape, or form. I demanded the right to examine the books,

but did not see them, and do not know of my own knowledge that any books were kept.'

"The last time I went to see Mr. Thacher (Mexican National Railway Company) Mr. Macdonell was with me. Mr. Thacher told us the books were in a desk in the office there. It was about the 1st of the month. They were busy and he asked us to come again. We were again told that the books were kept at the Mexican National Railway Company office. I don't know why they were kept there. So far as I know, Governor Hunt never kept any books. He never told me he kept them. When I went to him for the books he referred me to the Mexican National Railway Company. I never got any money from Governor Hunt; neither did those I represented. Macdonell and I and the other parties took possession of this mine when the receiver abandoned it in September, 1884. We are getting something now from these mines. I think it was in the first part of 1882 when I first went to Governor Hunt to look at the books and he referred me to Thacher. The three efforts to see the books were made within a period of two months. I think it was in May or June, 1882."

A. W. Wilcox, for plaintiffs, testified: "Hunt went to work developing the mines in May. I came here in September following. The books of the concern were kept in Laredo. Simply a tally book for the miners was kept at the mines. The main books of the transactions of the concern were kept at Laredo, first at the Wilson House, and also at the railway office. We had our books there at first, but Mr. Clifford took charge of the books after that, separate from the railway office. My understanding was that the books were open to the inspection of any one that wanted to see them. To the best of my belief the accounts of the business were footed up every month to show whether it was earning or losing and a statement made every six months. Of course I have not got the books. I would like to know myself where they are. I expect the Rio Grande & Eagle Pass Railway could produce them."

Hunt's evidence in this respect was as follows: "The accounts of the mining enterprise were kept in Laredo. Mr. Johns had charge of them; Mr. Spinelli also, and then Mr. Clifford, whose business was at the mines. Macdonell and Benavides had free access to the books. The books were kept here in Laredo and were always open. I instructed Mr. Johns to allow them to inspect the books whenever they came. They were balanced all the time. The books were well kept. I instructed that accounts should be cast up and losses and gains declared every six months after work began. Of course expenses were so heavy it was always running behind. During the whole of the three years while I operated the mines I nowhere near realized enough money to pay the current expenses of the business."

It appears that General Palmer, who was connected with the Mexican National Railway Company, was one of the beneficiaries under the con-

tract hereinbefore set out, and that on this account the books were kept for a time at the office of that company.

This suit to recover possession of the mines was brought by appellees on August 6, 1889, and appellants defended on the ground that the action was barred by four years adverse possession; and on the further ground that there had been a failure on the part of Hunt to perform the terms and conditions expressed in the contract between the parties, which entitled the owners to re-enter and hold the property discharged from all further right in the lessees.

The defendants presented the defense of limitation by exception, which was overruled, but we find no assignment of error presenting this ruling of the court.

The same defense was urged by plea, but the court instructed the jury that four years adverse possession would not bar the right of plaintiffs to recover possession of the mine. No assignment of error presented in brief of counsel presents this ruling.

The motion for new trial, which was overruled, did, however, claim that a new trial should have been granted on the ground that plaintiffs' action was barred, and on the further ground that the court erred in the instruction given to the jury on the question of limitation.

There is one assignment, however, in which the point is made that the judgment is contrary to law applicable to the facts proved, in that the action was brought more than four years after the cause of action accrued, and was therefore barred by the statutes of limitation.

It is not claimed that facts existed which would bar this action under any of the statutes regulating the period of limitation applicable to actions to recover real estate, nor were such statutes pleaded, but it is claimed that article 3207 is applicable to the case.

That article provides that "Every action other than for the recovery of real estate for which no limitation is otherwise prescribed shall be brought within four years next after the right to bring the same shall have accrued, and not afterward."

The inquiry arises whether or not this was within the meaning of the law an action to recover real estate, for if that be not its character the action would be barred.

Appellants by the terms of the contract did "let, lease, and donate unto the parties of the second part the right to mine coal or other minerals on all that tract of land known as the Santo Tomas Ranch, fronting on the Rio Grande, between El Arroyo Santo Tomas and El Arroyo de la Llave, with a depth of six leagues, reserving to themselves the use of the land for grazing or farming; to have and to hold the above mining rights unto the parties of the second part for the full term of fifty years."

The second and fifth paragraphs declare that the right thus conferred

shall be an exclusive right, and the mining enterprise under the exclusive control of the parties of the second part.

There can be no doubt that the contract conveyed to the lessees the right to all such use and possession of the entire tract of land as was necessary for the exercise of every right or use in the development and working of mines, and it also in express terms gave the right to use even the surface of the land for the purposes designated.

In Turner v. Reynolds, 23 Pennsylvania State, 206, it was held that "one who has the exclusive right to mine coal upon a tract of land has the right of possession even as against the owner of the soil so far as is necessary to carry on his mining operations." The same ruling was made in Caldwell v. Fulton, 31 Pa. St., 479; Harlan v. Coal Co., 35 Pa. St., 287; Caldwell v. Copeland, 37 Pa. St., 427; Armstrong v. Caldwell, 53 Pa. St., 284; Adams v. Iron Co., 7 Cush., 367; Zinc Co. v. Franklinite Co., 13 N. J. Eq., 323.

The question was carefully considered in United States v. Castillero, 2 Black, 220, in which it was held, as in cases before cited, that such a conveyance as that shown in this case conveys an interest in land.

In the case it was said "an action of ejectment, an assize, a common recovery, trespass, an action for use and occupation, and almost all the legal remedies applicable to 'land' may be maintained at common law with respect to a mine. But they do not lie for an incorporeal thing. Ad. on Eject., pp. 18–20; Co. Litt., 6a; Bainb. on Mines, p. 141; 2 Barn. & Ald., p. 737; 4 Barn. & Ald., p. 401; 2 Strange, p. 1142. * * * That in the case of royal mines the property in the mines remains in the crown, distinct from the general ownership of the land in which they are situated, and in case of base mines the owner may sever by his own grant the property in the mines from the property in the lands. But in both cases the mine or strata of minerals form part of the land itself, and are *land* in as strictly legal a sense as the nonmetalliferous portions of the soil."

All the authorities recognize the fact that the owner of lands on which mines are situated may retain the fee or a less estate in the surface and convey like estates in the minerals below; but, as stated by the Supreme Court of Massachusetts, "when so severed by the general owner and thus constituted a distinct estate, mines are still regarded as real estate and the general laws regarding real estate will apply to them. They must be transferred by deed; contracts in relation to them are within the statute of frauds; dower is to be assigned in them (Billings v. Taylor, 10 Pickering, 460); and all other rules regulating real estate, so far as applicable, will apply to them."

This being true, the statute of limitations applicable to appellees' right must be that which in terms is made applicable to lands. Caldwell v. Copeland, 37 Pa. St., 430; Armstrong v. Caldwell, 53 Pa. St., 288.

It is not contended in this court that Hunt did not in good faith begin

the work within the time contemplated by the agreement, but it is claimed that he failed to comply with conditions subsequent existing under the contract, and that for this reason the grantors had the right to re-enter and terminate the estate that had vested.

It is contended that the first, sixth, seventh, and tenth paragraphs prescribed such conditions; that there was a failure to perform them, and that for this reason the right of the grantors to terminate the estate by re-entry existed at the time they assumed to exercise that right.

If it be conceded that the provisions that the grantors should be permitted at all reasonable hours to inspect the books and accounts of the mining enterprise and that an account should be taken and dividends or losses declared every six months after the commencement of operation were conditions subsequent, on failure to comply with which the grantors would be entitled ordinarily to terminate the lease, we are of opinion under the case made by the uncontradicted evidence that they had waived that right before they took possession of the mine.

The enterprise was one which involved a large expenditure of money before it could be expected to become remunerative, and this appellees agreed to and as the evidence shows did furnish and continue to expend in forwarding the enterprise in which all were interested up to the time appellants assumed the right to re-enter.

That the enterprise was carried forward actively and in good faith until some time in April, 1884, the evidence clearly shows, and during the time intervening the commencement of the work and that date large expenditures of money were continuously made by appellees.

It is universally held that a grantor entitled to re-enter or forfeit an estate on breach of condition, who does not exercise this right when facts within his knowledge occur that would entitle him to do so, has waived his right or is estopped from exercising it in all cases in which after breach of condition he permits the grantee, without objection, to prosecute the enterprise and expend large sums of money in so doing, which must be lost to the grantee if a forfeiture be subsequently allowed.

If a grantor so situated on breach of condition desires to terminate an estate, good faith requires him to act promptly, and on failure to do so he should not be permitted to reap the benefit of money subsequently expended or labor bestowed, when by his failure to assert his right he induced a grantee to believe that he would not, and to continue the expenditure of money.

The application of the rule above suggested will be seen in the following cases: Ludlow v. Railway, 12 Barb., 445; Korner v. Contract Co., 9 Bush, 209; Sharon Co. v. City of Erie, 41 Pa. St., 351; Andrews v. Senter, 32 Me., 397; Hooper v. Cummings, 45 Me., 365; Guild v. Richards, 16 Gray, 326; Willard v. Henry, 2 N. H., 122; Barrie v. Smith, 47 Mich.; 132.

The record shows beyond controversy, if it shows a violation of the terms of the sixth and seventh paragraphs of the contract at all, that this occurred as early as June, 1882, but notwithstanding this and the further fact that appellees continued to develop the mine actively and to expend their money in so doing until April, 1884, no indication of intention to insist on a forfeiture on this ground was given until appellants took possession.

If these paragraphs imposed conditions for the noncompliance with which the estate might have been forfeited, a matter as to which there may be doubt, we are clearly of opinion that under the conceded facts appellants were not in a situation to insist on a forfeiture on these grounds at the time they re-entered.

It is further insisted that the part of the tenth paragraph which obligated appellees "to use all economy in the conduct and management of said mining enterprise" gave another condition on noncompliance with which appellants were entitled to terminate the estate.

We are of opinion that this proposition can not be sustained, and if for no other reason because what would be deemed the "use of all economy" would be too uncertain to recognize as a condition on which a forfeiture might rest.

It would vary as much as the opinions of witnesses might vary on a matter of fact about which no fixed rule determines compliance or noncompliance. Right to forfeit estates vested can not exist by reason of the existence or nonexistence of a state of facts not clearly defined.

If in any respect there was a failure of appellees to use economy in the conduct and management of the enterprise, it may be that they would be liable to appellants for any loss thus resulting, but in the development of a mine and bringing upon the market its products for the purpose of testing their market value and bringing them into notice, a very broad discretion might be exercised by persons situated as were appellees, and to render them subject to liability for not using what after events may show would have been economy, it ought to be shown that they did not in good faith act in accordance with their judgments as to what was for the best interest of all interested.

The court gave a charge as to what would constitute abandonment of the mining enterprise by appellees, and no objection is here raised to that charge except that it was not applicable.

Appellants requested the following charges, which were refused:

"9.   You are instructed that the consideration of the contract sued on moving the making thereof by C. M. Macdonell, now deceased, and Teresa P. de Benavides was the entering upon and management by A. C. Hunt, Sr., of the mining enterprise contemplated by said contract according to its terms and conditions, and that after commencing it the failure by said Hunt to continue the same according to its terms and con-

ditions would be in legal contemplation a failure of the consideration of said contract. If, therefore, you believe from the evidence that A. C. Hunt, in his management of said mining enterprise, did not use all economy, and did not allow free access to the books or accounts of such enterprise, and did not make and submit to the said Macdonell and Benavides written statements of the accounts showing the gains or losses of said enterprise at intervals of every six months after beginning the same, and that he suffered the mining operations to cease, and without protest permitted the mines to go into the hands of the receiver of the Rio Grande & Pecos Railway Company, and that during the time of the receiver's possession the said mines were not in said Hunt's possession and were not operated by the said Hunt according to the terms and conditions of said contract, then such facts would show the failure of the consideration of said contract and plaintiffs can not recover.

"10. If you believe from the evidence that the said A. C. Hunt, Sr., after beginning operations under the said contract left the State of Texas, after permitting the mines in controversy to go into the hands of a receiver of a railway corporation without protest, the said corporation having no rights or interest therein, and that said receiver remained in possession, and that said Hunt became insolvent and did not during such possession operate the said mines according to the terms and conditions of said contract, then under such facts the said Hunt's intention to abandon said mines may be presumed so far as to give C. M. Macdonell and Teresa P. de Benavides the right to enter into possession of the same."

The court, however, gave the following charge: "4. You are further instructed by the court that if you believe from the evidence that A. C. Hunt, as trustee for parties not named in said contract, did in good faith begin the execution and performance of their part of said agreement set out in full in plaintiffs' fourth amended original petition, to-wit, did begin the development of mines in good faith on or before May 15, 1881; and if you further believe from the evidence that the said A. C. Hunt and others did in pursuance of the terms of said contract continue to work developing coal mine or mines upon the land described in plaintiffs' petition from the 15th day of May, 1881, up to April 15, 1884, making expenditures of large sums of money in said work; and if you further believe from the evidence that the defendants, Macdonell for himself and Teresa Pisana de Benavides, did against the protest and against the consent of A. C. Hunt, Sr., as trustee, enter upon and take possession of said mines on the 22d day of September, 1884, then you are instructed that the facts, if such have been shown to be facts, that Hunt did not conduct the said mining enterprise with all economy, or that the books were not at all reasonable hours subject to the inspection of Macdonell and Benavides, or that A. C. Hunt failed to take an account every six months after work was begun and declare losses and gains, did not authorize the

said Macdonell and Benavides and their assigns to enter and take possession of said mines, and you are instructed to find in favor of plaintiffs, unless you find otherwise under the law as given in charge to you in other charges applied to the facts proved."

The court also gave another charge which would have authorized a verdict in favor of appellees if they in good faith in accordance with the terms of the contract begun the development of the mine on or before May 15, 1881. .

It will be observed that the ninth instruction refused embraced many matters, all and each of which were claimed to be sufficient grounds for forfeiture, and it must be borne in mind that a charge should be applicable to the facts to which the jury is to apply it.

As we have already stated, the court could not, under the uncontroverted facts, have instructed the jury that appellants were entitled to determine the estate by reason of a failure to comply with the requirements found in the sixth, seventh, or tenth paragraphs of the contract.

The evidence did not tend to show that Hunt surrendered the control of the mine at any time, but it does tend to show that for a time the receiver of the property of the railway company did assume, with Hunt's knowledge if not with his consent, some control over the mine; appellees, however, having an agent on the ground to care for it and to keep it in proper condition.

Under this state of facts the court would not have been justified in submitting to the jury whether there had been ground for forfeiture growing out of the fact that the receiver may have exercised some control over the mine for a time. If for a time Hunt or appellees had placed the mine under the control of the person who was receiver, under the terms of the contract this would have been no more a ground for forfeiture than would it have been had he placed it in the hands of some other person in good faith to be conducted for a time.

It is complained that Hunt was mining and selling coal at a loss prior to the time he ceased active operations, and if in view of that fact he ceased for a time active operations to avoid such loss and to await more favorable conditions, when the mine could be operated with profit, this surely could not be ground for forfeiture; and the evidence tends to show that this may have been the reason why he ceased active operations.

There was nothing in the contract which obligated him or his associates continuously to operate the mine or otherwise a forfeiture to accrue, although it was their duty "to furnish all the material, tools, implements, machinery, capital, and labor requisite and necessary for the working and development of any coal mine or mines that may be found on said land," and in good faith to develop the mine and to operate it as his or their judgments, looking to the interests of all, might dictate.

Although there was no express agreement or requirement that Hunt

should operate the mine if on development it was found to contain coal which could profitably be worked, yet there was an implied agreement to that effect, and a substantial failure in this respect ought to be held ground for forfeiture.

The case of Adams v. Copper Company, reported in 7 Federal Reporter, 634, is relied upon as an authority in favor of the proposition that Hunt and those associated with him had forfeited their right because they had not continued actively to operate the mine.    That was a case in some of its facts much like this, but in many respects very dissimilar.

The contract in that case provided that the grantees "shall at their own convenience and time, and at their own proper expense, make a fair test for minerals and metals on the aforesaid lands, and if after said test has been made any valuable minerals or metals shall be found worth working on said premises, to work it or cause the same to be done, and pay over to the aforesaid John L. Miller (grantor), his heirs and assigns, and to the said George E. Miller (the other grantor), his heirs and assigns, jointly, the one-fourth part of the net profits of the said minerals and metals."

The contract was made in 1854, and it was conceded that the grantees did some work in making explorations for minerals and metals in that year, but had done no work after that time.

The heirs of the grantors conveyed the property to the defendant corporation, the grantors having remained in possession, and the action was brought by the heirs of the grantees to recover possession in order that they might dig for and obtain minerals and metals to which they claimed to be entitled under the grant.    The action was brought probably in 1873, but not earlier.

The grant was held to be on condition subsequent, and though this was to be performed by the grantees "at their own convenience and time," the court correctly said:    "As the grantors derived no immediate benefit in consideration of the grant, and were to receive profits only upon the performance of the condition, it was the duty of the grantees to perform the condition subsequent in a reasonable time.    What a *reasonable time* is the law does not accurately define, but leaves that question to be decided by the judge according to the facts and circumstances of the case as admitted by the pleadings or as ascertained by the findings of a jury. As the evident intention and motives of the grantors in executing the grant without a present consideration were that they might receive continuous profits from the working of the minerals and metals in the land, the obligation of the grantees was continuous, and if they failed to open the mines, or discontinued to work them when opened and did not resume operations in a reasonable time, their estate under the grant would be forfeited by this breach or nonperformance of the condition subsequent

contained in the grant." In that case nearly twenty years had elapsed during which the lessees had done nothing.

There was no charge asked in the case before us which would have submitted to the jury the question whether the time intervening cessation of active operations and the re-entry by appellants was unreasonably long under the circumstances for appellees to cease active work; but had such a charge been given and a finding returned that the cessation was unreasonably long, we are of opinion that it should have been set aside.

In cases in which the grantor has no pecuniary interest in the continuous possession and use of property conveyed on conditions subsequent, a failure to use for many years has been held not to operate a forfeiture. Osgood v. Abbott, 58 Me., 73; Mills v. Evansville, 58 Wis., 135.

The rule, however, ought not to be so latitudinous in cases in which the grantor is expected to be benefited by the use, and where contemplated profits to be derived from the use form in part the consideration for the grant; but even in this class of cases it has been held that temporary cessation to use does not forfeit the grant.

In the case of Croft v. Lumley it appeared that the plaintiff leased to the defendant an opera house for a term of years, and the instrument by which this was done provided that the lessee should not convert the house "to any other use than for acting or performing operas, plays, concerts, balls, masquerades, assemblies, and such theatrical and other public diversions and entertainments as have been usually given therein, *but shall and will during all the said term use his and their utmost endeavors to improve the same for that use and purpose."*

The lessor sought to recover possession of the property on several grounds, one of which was that the lessee closed the house at the end of the season for the year 1852 and did not open it at all during the following year.

It was contended that the part of the contract quoted was intended to secure the use of the house for the purposes named in such manner as to make it attractive, draw custom, and thus raise its rental value, and that "not to keep open a theatre, like not keeping open a hotel, is to ruin it; the public go elsewhere."

The matter came before the House of Lords, and the opinions of the judges were called for and given to the effect that the purpose of the clause quoted was that claimed by the plaintiff, but they held that the temporary closing of the house was not a breach which would work a forfeiture, and so the case was decided.   6 House of Lords Cases, 672.

While in that case the lessor was receiving an annual rental the contract contemplated further profit to him in the increased attractiveness of the house from continuous use during seasons for the purposes contemplated.

If cessation for a time actively to use property granted on condition

that it shall be used for a named purpose be not such as to indicate clearly an intention to abandon an enterprise such as the parties in this cause were engaged in, then it would seem that before the lessor should be heard to claim a forfeiture he should show a demand that the lessee go forward with the enterprise, and a failure to do so, before his right to a forfeiture would exist under a contract such as that before us.

In Lindsey v. Lindsey, 45 Indiana, 567, it was said that "it is well settled that before there can be a forfeiture of an estate held on conditions subsequent there must be a demand on the part of the person entitled to insist upon its performance, whether the condition consists in the payment of money or the performance of some other act, and a refusal on the part of the person in whom the title is vested." Citing Bradstreet v. Clark, 21 Pick., 389.

In its broad statement this opinion may go further than the weight of authority would justify, for much must depend on the terms of the contract and character of the act to be performed.

We are of opinion, however, that in cases like this, where there has been an honest effort evidenced by long use of the premises for the contemplated purpose, attended with a heavy outlay of money by the grantee to make the property beneficial both to the grantor and the grantee, that a forfeiture should not be permitted unless upon demand the grantee fails within a reasonable time thereafter to proceed with the work.

In cases like this we may even go further with propriety, and hold that in case of such demand no forfeiture should be allowed for temporary cessation to prosecute actively the enterprise, if it be shown that such cessation was beneficial to all parties, unless the terms of the contract be imperative.

The contract before us contains no provision that temporary cessation of work in the enterprise should operate a forfeiture; and looking to the nature of the undertaking and all the difficulties surrounding the enterprise we do not believe that the parties contemplated that a right to forfeiture should arise under the facts of the case.

Under the facts there was no error in refusing the ninth charge requested by appellants nor in giving the fourth charge given.

The first paragraph of the charge given, if ground for forfeiture for breach of condition subsequent had been shown, would require a reversal of the judgment; but, in view of the facts we have considered and the conclusions we have reached, the result could not have been different had that charge not been given, for no ground for forfeiture existed.

The tenth instruction requested and refused was properly refused; for it would have informed the jury that they might presume that Hunt intended to abandon the enterprise from a state of facts entirely consistent with a contrary intent.

Appellants pleaded that appellees had abandoned the enterprise before

they re-entered, and the court gave to the jury a charge informing them what would constitute abandonment, which it is not claimed was incorrect as an abstract proposition, but it is claimed that it was not applicable to, the case, taking into consideration the relation created between plaintiffs and defendants by the contract.

We do not see that such relation would in any manner make that abanment which would not have been had not the relation existed, although that relation may have imposed duties and given rights which would have no existence between strangers.

The other assignments of error relate to the action of the court in over-ruling a motion for new trial, which was based on matters already considered.

We find no error in the proceedings of the court below of such character as to require a reversal of the judgment, and it will be affirmed.

*Affirmed.*

Delivered January 30, 1891.

*Atlee & Earnest* and *Jno. A. & N. O. Green,* for appellants, argued a motion for rehearing.

The motion was refused.