## DEL–TEX PRODUCTION CO. et al. v. WEST. (No. 10381.)

(Court of Civil Appeals of Texas. Fort Worth. Nov. 10, 1923. Rehearing Denied Dec. 8, 1923.)

**Mines and minerals ⛬78(2)—Lease requirement of 50-barrel production held ambiguous, and not to sustain forfeiture.**

An oral lease providing that, if drilling of the well did not get as much as a 50-barrel production, lease would revert to lessor, *held* ambiguous as to whether it required an average production of 50 barrels a day during the life of the lease, and did not sustain a forfeiture because of the cessation of production due to cave-ins, loss of tools, etc.

Appeal from District Court, Young County; H. R. Wilson, Judge.

Suit by Mrs. Emma West against the Del-Tex Production Company and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

Kay, Akin & Kenley, of Wichita Falls, and Marshall & King, of Graham, for appellants.

Brown & Graham, of Graham, for appellee.

DUNKLIN, J. On March 22, 1918, Mrs. Emma West executed an oil and gas lease on 160 acres of land situated in Young county to C. F. Colcord & Co. The lease contained this provision:

"To have and to hold, unto the said C. F. Colcord & Co., heirs and assigns, for the full space and term ending August 4, 1921, and for such other and future period of time as oil or gas shall be produced on said land."

A cash consideration of $80 was recited. It was further stipulated that, unless the

grantee should begin the drilling of a well on the land within one year from the date of the lease, or in lieu thereof should pay to the grantor the sum of $80 on or before the beginning of each period of one year until a well should be begun, then the lease should become null and void. The lease was duly transferred to the Del-Tex Production Company, which company went into the hands of C. Fox Clark, the duly appointed receiver.

This suit was instituted by Mrs. West against the receiver and a number of other persons to whom the production company had assigned interests in the lease to cancel the same, and from a judgment in favor of the plaintiff for the relief prayed for, the defendants have appealed.

Prior to August 4, 1921, the Del-Tex Production Company had begun a well and had drilled the same to a depth of approximately 3,600 feet, at a cost of between $50,000 and $80,000. On July 19, 1921, Mrs. West executed the following extension agreement:

"Whereas, on the 22d day of March, 1918, Mrs. Emma West, a feme sole, made, executed, and delivered to C. F. Colcord an oil and gas lease covering the south one-half of T. E. & L. survey No. 1015, abstract No. 824, situated in Young county, Texas, and which lease is now of record in vol. 71, page 315, of the Deed Records of Young County, Texas; and

"Whereas, said lease is now being drilled for oil and gas and the prospects are favorable to production therefrom; and

"Whereas, said lease will expire on or about the 4th day of August, 1921; and,

"Whereas, it is the desire of the lessor and the lessee and his assigns to continue the drilling of said test well until properly completed: And,

"Now, therefore, I, Mrs. Emma West, a feme sole, in consideration of the premises and the sum of one dollar cash in hand paid by C. Fox Clark, receiver, do hereby extend the time of said lease for a period of ninety days from and after August 4th, 1921, and this extension shall inure to the benefit of all the owners and holders of said oil and gas lease.

"It is further agreed and made a part of this contract that in case the further drilling of this well shall not get as much as a 50 (fifty) barrel producer, then in that event this lease shall revert back to the said Mrs. Emma West at the expiration of the 90 days' extension."

The sole ground relied upon by plaintiff for forfeiture consisted in allegations as follows:

"That the said contract above mentioned has expired and the said C. Fox Clark, receiver for the Del-Tex Production Company, has not complied with the terms of same, and has failed to cause a well to be drilled making as much as a 50-barrel producer at the expiration of the contract as herein set forth."

One of the defenses to the suit was that during the life of the original lease the well had produced oil and gas, and that even in the absence of the extension agreement has no right of forfeiture existed, by reason of the provision in the original lease stating the condition of forfeiture to be the failure to complete a well which "shall be a producer of oil or gas." Another defense was that during the life of the extension agreement the well did produce oil at the rate of more than 50 barrels per day for several days; that the cessation of production was due to cave-ins and loss of tools, without any fault on the part of the defendant; and that the receiver was making diligent effort to overcome such difficulties at the time the plaintiff declared the lease forfeited and refused to permit further prosecution of the work.

The following are special issues submitted to the jury with their findings thereon:

"No. 1. Was oil or gas discovered on the premises in question on or before August 4, 1921? Ans. Yes.

"No. 2. Did the defendants complete a well which produced oil or gas on or before August 4, 1921? Ans. No.

"No. 3. Did the defendants complete a 50-barrel producer on or before November 4, 1921? Ans. No."

The uncontroverted proof, including the testimony of plaintiff's witness Swope and several witnesses for the defendants, shows that the well was shot on the 28th day of August, 1921, and that immediately thereafter it flowed oil at the rate of more than 50 barrels per day for two days, when further flow ceased by reason of some obstruction in the well which required removal; that after some work on it it again flowed oil in considerable quantities, which, according to some witnesses, amounted to as much as 50 barrels per day. The proof further shows that following other intermittent flows of oil several hundred feet of the well caved in, and the tools were lost, and that the receiver was endeavoring to remove those obstructions when the plaintiff notified him that the lease was terminated, and that she immediately thereafter instituted this suit. The receiver testified without contradiction that a total of 940 barrels of oil was taken from the well prior to the time plaintiff gave him notice of the termination of the lease. But it was proven by uncontroverted testimony that the production of the well did not average 50 barrels a day from the time it was shot until plaintiff gave the receiver that notice.

Since plaintiff did not seek a cancellation of the lease on the ground of abandonment, that question is not in the case, and the decisions cited by the appellee, such as Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464, and Carey v. T. P. C. & O. Co. (Tex. Civ. App.) 237 S. W. 309, have no application.

As noted the sole ground upon which plaintiff claimed a forfeiture was that the receiver did not "get as much as a 50-barrel producer" before the expiration of the extension period given by the agreement dated July 19, 1921. It is insisted by appellee that

the language quoted from the extension agreement meant that the well should produce oil on an average of 50 barrels per day for all time, and the following testimony of the plaintiff is referred to in support of that construction:

"At the time I executed this last contract of extension between me and Mr. Clarke as receiver for the Del-Tex Production Company, Mr. McBrayer and Leslie Scott brought it to me. I was at home at the time, where I have lived for 13 years. My husband is dead. There was no one else there. They came to me in the morning to give them a 90-day extension, and I was busy, and asked them to come back in the afternoon and let me think it over; and they come back, and I hadn't had time to think it over, and wanted them to wait until next day; and they were in a hurry and wanted me to sign it right then; and I wanted them to promise a 100-barrel well if I signed it, and they said 'No'; they wouldn't do that; they wouldn't promise only 50 barrels; and I said that was too little; and they said 50 barrels was as much as they could promise, and that 50 barrels a day would be quite a lot of oil, and that was all they would promise; and that was the way it was put in the contract, a 50-barrel producer. That was not for one day, but for all time."

There is no pleading by plaintiff to the effect that it was understood and agreed between the parties to the extension agreement that the lease should terminate unless the well then being drilled should, before the expiration of the extension period, prove to be a producer of oil at the rate of 50 barrels per day for all time, and that by mutual mistake of the parties a stipulation to that effect was omitted from the extension agreement. But plaintiff elected to stand upon the instrument as written. If the stipulation in the extension agreement referred to be construed as meaning that the well must produce oil at the rate of 50 barrels per day, then a production of that amount for one day, according to a strict construction, would be a compliance with the condition. And, even though it be said that the language used is subject to another interpretation, to wit, that the well must prove to be one which would produce oil on an average of 50 barrels per day for all time, as testified to by plaintiff, then the terms of the agreement would be ambiguous, and that fact of itself would condemn the stipulation for forfeiture, as held by our Supreme Court in Decker v. Kirlicks, 110 Tex. 90, 216 S. W. 385, from which we quote the following:

"The oil lease contained this provision: 'It is further agreed that in the event oil is found in paying quantities in said first well, then the lessee agrees and covenants that within thirty days from the completion of such · successful well he will begin the boring of a second well on some other acre of said tract herein leased, and continue to bore additional wells with due diligence in such order as to additional wells, on the tract herein leased as developments may justify, until at least five or six wells have been completed, or the acre upon which said second party has failed to drill a well reverts to the first party by written notice to that effect being served upon said second party by said first party.'

"The tract of land leased embraced about 20 acres and was laid off in acre blocks. Decker bored his first two wells upon different acres. He completed five wells with due diligence, but four of them were upon the same acre. Upon the question as to whether this provision in the lease would sustain a forfeiture because of a failure to bore all of the five wells upon different acres, the Court of Civil Appeals held that the provision was ambiguous and that its meaning should have been submitted to the jury for decision.

"If the provision is ambiguous, that alone condemns it as a forfeiture provision. A forfeiture should rest upon surer ground. Where a contract is so vague in its terms that a court cannot determine its meaning, it would be unjust to enforce a forfeiture under it against one whose only fault has been to possibly mistake its meaning. Forfeitures are harsh and punitive in their operation. They are not favored by law, and ought not to be. The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear—whose unequivocal character may render its exercise fair and rightful.

"It is not necessary that we determine whether this clause in the lease requires the boring of the five wells upon five different acres, or sanctions their location upon but two different acres. If it be conceded that it admits of the first construction, it is not certain that such is its true construction. It does not plainly say that each of the wells shall be upon a different acre. It is only by inference, at best, that such meaning can be gained from the language. A provision so indefinite as to the obligation imposed is incapable of supporting a forfeiture. Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396."

What was said by the Supreme Court in that decision applies with special force in this case, in view of the large expenditures of money in order to develop the lease in controversy in the drilling of a well more than 3,600 feet in depth, all apparently in the utmost good faith, in connection with diligent efforts to a successful operation of the well, continuing up to the very date that the forfeiture was claimed by the plaintiff.

For the reasons noted, the trial court should have instructed a verdict in favor of the defendants, and for that reason the decree of forfeiture awarded will be reversed, and judgment will be here rendered denying appellee any right of recovery upon her alleged cause of action, without a discussion of the other assignments of error presented in appellants' brief, a determination of which becomes unnecessary.