Florence, Florence & Meredith, of Gilmer, for appellant.

Fred Erisman, Dist. Atty., of Longview, and Spurgeon E. Bell, State's Atty., of Austin, for the State.

HAWKINS, Presiding Judge.

An indictment was returned into the District Court of Gregg County, Texas, on June 30, 1942, in which relator was charged with murder. On the same date that the indictment was returned the district judge fixed relator's bail at the sum of $20,000. Later relator obtained a writ of habeas corpus from said judge in which he sought to have the amount of said bail reduced. Upon a hearing the court reduced the bail to $10,000. Relator excepted, complaining that it should have been reduced to not more than $5,000, and later filed a motion before said trial court setting up that he had not been able to make bond in the sum of $10,000, and asking for a still further reduction in said bond. After a hearing the court declined to reduce the bond below the $10,000, whereupon appellant appealed to this court.

This court is advised by the affidavit of the District Attorney of Gregg County that on the 10th day of October, 1942, relator secured sureties on his bond in the sum of $10,000 and was released by the Sheriff of Gregg County, Texas, and that he is no longer confined in custody, and said District Attorney moves to dismiss the appeal because the question sought to be settled has now become moot.

The State's motion is sustained and the appeal is dismissed.

### FREEMAN et al. v. MAGNOLIA PETROLEUM CO. et al.
### No. 5462.

Court of Civil Appeals of Texas. Amarillo.
Sept. 21, 1942.

Rehearing Denied Oct. 26, 1942.

B. N. Richards, of Dalhart, and Kearby Peery and T. R. Boone, both of Wichita Falls, for appellants.

Walace Hawkins and Earl A. Brown, both of Dallas, and Morgan, Culton, Morgan & Britain, of Amarillo, for appellee Magnolia Petroleum Co.

Frank M. Tatum, of Dalhart, and Underwood, Johnson, Dooley & Wilson, of Amarillo, for appellees Hagy, Harrington, and Marsh.

STOKES, Justice.

This suit was filed January 7, 1941, by appellant M. H. Freeman, for himself and as independent executor of the estate of Wayne Freeman, deceased, and also as next friend for certain heirs of Wayne Freeman, deceased, joined by Naona Freeman, surviving wife of Wayne Freeman, against appellees, the Magnolia Petroleum Company, a corporation, Lawrence R. Hagy, D. D. Harrington, and Stanley Marsh, who appear from the record as constituting the partnership of Hagy, Harrington & Marsh. The purpose of the suit was to cancel an oil and gas lease that had been executed by the Freemans to George E. Mager on April 7, 1930, and duly assigned to appellees, covering three specified tracts of land located in Sherman and Hansford Counties, comprising in the aggregate 7,499 acres. The lease recited a cash consideration of $1,000 and royalties therein provided, as well as the agreements of the lessee therein contained, and provided for a primary term of ten years and as long thereafter as oil, gas, or other minerals should be produced from the leased land. The royalties which the lessee agreed to pay to the lessor in the event oil, gas, or other minerals were discovered and produced were: (1) One eighth of the oil; (2) twenty-five per cent of the market value at the plant of gasoline manufactured from gas produced at any well or wells drilled on the land; (3) one eighth of the amount received and collected by the lessee from the sale of gas at the wells; (4) a royalty of fifty dollars per year on each gas well from which gas only was produced while gas therefrom was not sold or used off the premises, and while said royalty was so paid said well should be held to be a producing well under paragraph number two of the lease; and (5) on all other minerals mined and marketed one eighth, either in kind or value, at the well or mine except that the royalty on sulphur was fixed at fifty cents per long ton. These provisions were contained in section number three of the lease.

The record shows without dispute that the appellees drilled one well near the center of the 7,499-acre body of land in an effort to discover and produce oil, gas, or other minerals, which resulted in the discovery of a large amount of gas, such well being capable of producing as much as eighteen million cubic feet of gas per day. None of the gas was ever marketed, sold, or used off the premises and no other wells were ever drilled thereon. Appellants pleaded that appellees were not engaged in operations for mining, drilling, or reworking any well or mine on the land at the end of the primary term of ten years, namely, April 7, 1940, and never thereafter began any kind or character of operations for the drilling of any well but completely ceased their operations for a period of nine months after the primary term provided in the lease had expired, and that by reason thereof the lease terminated at the end of the primary term and appellees therefore had no further rights in, or title to, the land. They prayed that the lease be in all things canceled and held for naught, that the asserted claim of appellees to the premises be removed as a cloud on the title and, in the alternative, that appellees be required to commence the drilling of wells on the land, complete the same with due diligence, and prosecute such operations until a well shall have been drilled on each forty acres.

At the close of the testimony appellants urged a motion for a peremptory instruction in their favor upon the grounds that gas only having been discovered on the land and the same not having been sold or used off the premises and appellees not having paid or tendered the fifty dollars before the expiration of the primary term of the lease, and no further operations for the discovery or production of oil, gas, or other minerals having been prosecuted by appellees after the primary term of the lease had expired, the lease was forfeited when the primary term expired and they were therefore entitled to a peremptory instruction requiring the jury to return a verdict in their favor. The court overruled the motion and submitted the case to the jury upon special issues.

In answer to the special issues the jury found: (1) That the gas well on the premises was completed December 22, 1939; (2) that appellees did not fail to use reasonable diligence in drilling additional wells for gas and marketing same from the 7,499 acres prior to January 1, 1941, and subsequent to April 7, 1940, the end of the primary term of the lease; (3) that appellees had not abandoned the premises prior to January 1, 1941, for the purposes of the

exploration, development, and production of oil and gas; (4) that a reasonably prudent person engaged in oil and gas production would not have performed additional drilling for gas or marketed gas from the premises prior to January 1, 1941, and subsequent to April 7, 1940, the end of the primary term of the lease; and (5) under all of the circumstances a prudent operator would not have drilled an additional well, or wells, for gas on the leased premises.

After the verdict was rendered, appellants filed and urged a motion for judgment non obstante veredicto based upon virtually the same grounds as their motion for a peremptory instruction, which was likewise overruled and the court rendered judgment in favor of the appellees, decreeing that appellants take nothing by their suit. Appellants duly excepted to the judgment and, their motion for new trial being overruled, they have perfected an appeal to this court, contending that the judgment of the court below is erroneous and should be reversed because of the refusal of the court to grant their motions for a peremptory instruction and judgment non obstante veredicto, together with their requests for the submission of certain special issues which pertained to the same questions included in their motions.

The controlling questions presented by the briefs are: First, that the oil and gas lease in question was not an absolute conveyance of the minerals in the land but conveyed a determinable fee which would lapse for lack of production of oil, gas, or other minerals after the primary term of ten years from April 7, 1930, and it was necessary, therefore, that appellees have a producing well on the land from which they were actually producing oil, gas, or other minerals on April 7, 1940, in order to extend the lease beyond that date; secondly, that it was necessary for appellees to pay or tender before the end of the primary term, or in advance, the royalty of fifty dollars per year specified in the lease as royalty upon a gas well from which the gas was not sold or used off the premises, in order to preserve the lease under that provision for the payment of royalty and establish the well as a producing well; thirdly, that the court erred in refusing to permit their counsel to argue to the jury the question of lack of diligence on the part of appellees in failing to establish and maintain a plant to treat the gas and re-

move from it vapors, the removal of which was necessary before the gas could be transmitted through pipe lines; and, fourthly, that the court erred in refusing to permit their counsel to argue to the jury, in effect, that appellees were negligent in failing to provide a pipe line through which the gas produced from the well in question could have been transmitted to a market.

 The law with reference to the nature of the title acquired by the lessee in an ordinary oil and gas lease is well established in this State. He is vested with the title to the oil, gas, and other minerals, and his title is what is known to the law as a determinable fee which is lost upon cessation of the use of the land for the purposes of exploration, development, and production of the minerals that constitute the subject of the contract. Likewise, his interest is lost upon failure to pay the rentals provided in the lease on or before the date they become due. These are conditions upon which the lessee holds his title and he is divested of the title upon his failure to comply with such conditions, because the lease so provides. After the discovery of oil or gas under a lease which fails to define his duty with regard to further development, the law implies the obligation to continue the development and production of oil or gas with reasonable diligence. Thus, an oil and gas lease contains two distinct elements, namely, conditions and covenants. Failure to comply with a condition in such a lease works a forfeiture of the interests of the lessee, but a breach of a covenant, express or implied, subjects him to a suit for damages. W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; Benavides v. Hunt, 79 Tex. 383, 396, 15 S.W. 396; Grubb v. McAfee, 109 Tex. 527, 530, 212 S.W. 464; Freeport Sulphur Co. v. American Sulphur Royalty Co. of Texas, 117 Tex. 439, 6 S.W.2d 1039, 1042, 60 A.L.R. 890; Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ.App., 107 S.W.2d 746; McGraw Oil & Gas Co. v. Kennedy, 65 W.Va. 595, 64 S.E. 1027, 28 L.R.A.,N.S., 959.

 Appellants' first contention is that the lease lapsed as a matter of law because the appellees were not producing oil or gas at the end of the primary term, April 7, 1940, and were not then engaged in an attempt to develop the land for the production of oil or gas. As we have shown, the lease provided for certain royalties to be paid to the lessor under the various condi-

tions that might develop from the exploration contemplated by it. One of those was to the effect that if the lessee should drill a well and produce gas only and such gas should not be sold or used off the premises, the royalty to be paid to the lessee would be fifty dollars per year, and that while said royalty was so paid, the well should be held to be a producing well under paragraph number two of the lease. Paragraph number two provided that, subject to other provisions of the lease which were not conditions, as were fully provided for in paragraph number eight, the lease should remain in force for a term of ten years, called the primary term, and as long thereafter as oil, gas, or other minerals were produced from the land. During the primary term of the lease appellees drilled a well and discovered gas in large quantities. There were no available facilities for marketing the gas and, therefore, none of it was ever sold or used off the premises. This had the effect of bringing about the situation specifically provided for by the lease and placed the well in the category of one in which gas only was produced but was not sold or used off the premises, and made appellees liable to the appellants for a royalty of fifty dollars per year. It was a producing well under paragraph number two of the lease which provided that the lease should remain in force as long as oil or gas was produced from the land.

There are a number of reasons why appellants' contention that the lease became forfeited at the end of the primary term can not be sustained. First, the lease itself placed the well directly in the category of a producing well. It specifically provided that the well drilled should be held to be a producing well and that the royalty thereon should be fifty dollars per year. Secondly, in paragraph number eight the lease specifically provided: "After discovery of oil, gas, or other minerals upon said premises, the title to all minerals in and upon and underlying the surface of the land described in this lease shall remain and be vested in lessee and shall not revert to lessor nor end until there is a complete, absolute, and intentional abandonment by the lessee of each and all of the purposes, either expressed or implied, of this lease and every part and parcel of the lands described herein. Such abandonment is the only manner by which lessee's title to said minerals can be ended and title

to said minerals be reinvested in said lessor." The record does not show an abandonment of the lease as contemplated by the foregoing provision, and the jury found against appellants on the question of abandonment. We can discern no difference between the obligation of appellees to pay the royalty of fifty dollars per year and their obligation to pay any other royalty provided by section three of the lease. If appellees had developed oil in paying quantities, the royalty to be paid appellants would have been one eighth of the oil produced and saved from the land, same to be delivered at the wells or to the credit of the lessor in the pipe lines to which the wells might be connected. This provision, as well as all other obligations relating to the payment of royalties, was a covenant, the breach of which would subject the appellees to a suit for damages. Appellants would not have been entitled to a cancellation of the lease, for the simple reason that the obligation to pay royalties was a covenant and not a condition, as is well established by the above-cited authorities and many other decisions of the courts of this State. Instead of producing oil, however, appellees produced gas only and, no market being available, they did not sell or use any of the gas off the premises. The lease plainly provides that under these circumstances the royalty to be paid by appellees is fifty dollars per year. It being designated as royalty, appellees were obligated to pay it in the same manner as they were obligated to pay other royalties provided in the lease, and such obligation can not be considered more than a mere covenant, the breach of which gives rise to a suit for damages.

The undisputed testimony showed that appellees did not pay the royalty of fifty dollars on or before April 7, 1940, the end of the primary term of the lease, nor tender the same to appellants until sometime in September of that year. Appellants contend that the effect of the provision for the payment of the royalty of fifty dollars was to make its payment a condition and not a covenant. The provision is that the lessee will pay a royalty of fifty dollars per year on each gas well from which gas only is produced while gas therefrom is not sold or used off the premises, "and while said royalty is so paid said well shall be held to be a producing well under paragraph number 2 hereof." The contention is that the clause "while said royalty is so

paid" necessarily means that if there should be a period of time following the end of the primary term in which the royalty was not paid, then the well, during that time, could not be held to be a producing well. They assert that the fifty dollars was not paid nor even tendered to them until sometime in September 1940 and, therefore, the royalty had not been "so paid" from April 7, 1940, until September, 1940. They say further that the mere tender of the royalty more than four months after the end of the primary term of the lease could not revive a lease that had already expired. We can not agree with appellants in this contention. As we have already said, the payment of fifty dollars being royalty, it was payable as any other royalty that might accrue under the lease. Section ten of the lease provided that the lessee should have the right at any time to surrender the lease in whole or in part by paying to the lessor ten cents per acre for each acre so surrendered and by executing and delivering to appellants an instrument in writing evidencing such surrender. The phrase "while so paid" had the effect of facilitating the provisions of section ten and extending to the lessee the privilege of surrender as therein provided regardless of his absolute and unconditional agreement, contained in section three, to pay the royalty of fifty dollars each year.

The next contention made by appellants is that the court erred in sustaining objections of appellees to, and instructing the jury not to consider, certain arguments to the jury made by appellants' counsel in which he asserted it was the duty of the appellees to construct a treating plant for removal of vapors from the gas produced from the well so it could be transmitted through pipe lines to a market, and that it was their duty to provide pipeline facilities for the transportation of the gas to a market. It was shown by the evidence that there were several pipe lines within a distance of less than one hundred miles from the well, but that they were not available to appellees, and their owners had declined to receive any gas in addition to that which was covered by former contracts. Therefore, no market was available in the vicinity, and the gas from the well could have been disposed of only through a pipe line with a terminus in what is known as the Mesaba Range in Minnesota. It was shown that a pipe line to this market had been authorized by the Federal Power Commission upon the application of a concern with which appellees had some connection, but that its construction would have involved an expenditure of $14,550,000 and that due to war conditions the enterprise was not undertaken. We think it is obvious that appellees were under no obligation to construct a pipe line at an expense of more than fourteen million dollars in order to provide a market for the gas being produced by them, and since the treating process was designed only to remove vapors from the gas in order that it might be transmitted through a pipe line to market, appellees were under no obligation to construct and operate a treating plant. In sustaining the objection of appellees to the argument of appellants' counsel, the court instructed the jury that appellees were under no legal obligation to construct either such a pipe line or treating plant, and this instruction constitutes the basis of appellants' assignment of error. We find no merit in this contention of the appellants. Even if the lease had not made specific provision for its continuance in force and effect upon the production of gas in the manner in which the testimony shows it was produced, there would have been no obligation resting upon appellees to expend such enormous amounts of money as would have been involved in constructing the pipe line and plant in order to find a market for the gas which they were producing. Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.2d 1031, 60 A.L.R. 936; Kretni Development Co. v. Consolidated Oil Corporation, 10 Cir., 74 F.2d 497; Hutchins v. Humble Oil & Refining Co., Tex.Civ.App., 161 S.W.2d 571.

We have carefully examined all of the assignments of error, points, and propositions presented by appellants and, in our opinion, no reversible error is shown by any of them. The judgment of the trial court will therefore be affirmed.