**DUKE et ux. v. STEWART et al. (No. 679.)**

(Court of Civil Appeals of Texas. Beaumont. April 19, 1921.)

**Mines and minerals ⬤⟳78(2)—Development of a portion of land by sublessee precludes forfeiture of lease.**

Where owner leased land as an entirety and by lease required lessees to develop the land for oil, without providing for development of any particular acre or tract thereof, the development of a portion of the land by a sublessee accrued to the benefit of the lessee, precluding the owner from declaring lease forfeited as to another portion held by lessee or successors for nondevelopment thereof.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Suit by V. M. Duke and wife against John S. Stewart and others. Judgment for defendants, and plaintiffs appeal. Affirmed.

Tharp & Tharp, of Houston, for appellants. A. C. Van Velzer, Homer Stephenson, Guynes & Colgin, R. W. Culberson, and A. R. & W. P. Hamblen, all of Houston, for appellees.

WALKER, J. This suit was brought by V. M. Duke and wife against John S. Stewart, P. H. Briant, D. F. Boyles, W. A. Myrick, J. W. Oliver, F. E. Creale, H. T. Straiti, E. F. Simms, E. F. Simms & Co., Magnolia Petroleum Company, and the Texas Pure Oil Refining Company, to cancel an oil lease executed by appellants to John S. Stewart, who held the same for the benefit of himself and P. H. Briant, and assignments made by Stewart and Briant and their assigns "on the grounds of failure to comply with the terms of the lease, and abandonment for failure to develop with reasonable diligence." The original lease was as follows:

"State of Texas, County of Harris.

"This contract made and entered into between V. M. Duke and wife, H. R. Duke, parties of the first part, and John S. Stewart, party of the second part, witnesseth:

"(1) Parties of the first part have leased and let unto the party of the second part for the purposes of development and production of oil and gas, subject to the provisions hereof, the following described land, in Harris county, Texas, to wit: A tract of land containing about 126 acres, upon which parties of the first part now reside, being bound on the west and south by Goose creek, and the land of John Gaillard, on the east and north by the land of Fred Pelley and the Wiggins heirs, save and except a strip of about ten acres heretofore sold to C. E. Morgan and five acres reserved and hereinafter more particularly described, which five acres are absolutely reserved from this lease.

"(2) Parties of the second part shall begin actual operations on said land within 90 days from the delivery hereof, and in the event such operations are not commenced within said period then at any time thereafter parties of the first part may, by notice in writing and delivered to parties of the second part, require such commencement within 30 days after delivery of such written notice, and unless parties of the second part shall commence operations within 30 days after receipt of such notice this lease shall be forfeited. All lines must be protected as against producing wells completed on adjoining lands.

"(3) Parties of the second part shall pay to parties of the first part the sum of $100.00 per month, payable in advance monthly until oil in paying quantities is produced on said land, and until the lessor's royalty oil shall amount in value to $100.00 per month, and this lease shall remain in effect as long as such operations are continued or as long as oil in paying quantities is produced on said land.

"(4) Of the oil produced and saved from said land parties of the second part shall deliver to parties of the first part one-eighth as royalty free of all expense to parties of the first part, the same to be delivered from settling tanks and into pipe lines as parties of the first part may direct, but if parties of the first part desire their portion of such oil delivered into tanks or other storage, said tanks or storage shall be furnished by said parties of the first part, otherwise said royalty oil may be run into pipe line by parties of the second part and paid

for on run tickets according to the prevailing custom of the oil field, and parties of the second part guaranty payment of said royalty oil in cash. Oil used for fuel in the conduct of operations on said land may be so used without charge.

"(5) Parties of the second part shall have the right of ingress and egress upon said land and shall order their manager or employés to respect and protect the fences of first parties and to close all gates as found, and may assign and sublease said premises in whole or in part, and parties of the second part may place and construct all necessary machinery, tanks, reservoirs, pipe lines and apparatus on said land, and remove same at any time within sixty days after termination hereof, but such tanks to be used only for oil produced on this lease and not for adjoining land.

"(6) If gas is produced and sold from said land, parties of the second part shall pay to parties of the first part one-sixth of all money received from sale of gas.

"(7) It is understood that there is reserved from provisions of this lease five (5) acre strip beginning on Goose creek at the northeast of said ten (10) acre tract heretofore sold to C. E. Morgan; thence running along the north line of said Morgan tract to this northeast corner; thence in a northerly direction to a point on Goose creek, parallel with the Morgan north line and thence down Goose creek to the place of beginning, shall include five acres, of land. It is agreed that no well shall be drilled within 500 feet of lessors' present residence until oil in paying quantities has been found on said leased land.

"(8) It is distinctly understood, agreed and stipulated that every provision, condition and requirement contained herein is a material one and enters into the consideration of this lease, and failure of the lessee herein, styled parties of the second part, to perform any of said conditions, requirements and provisions or a breach of any such terms, condition and requirement shall forfeit and terminate this lease at the option of the lessors or their assigns herein. It is further agreed that the terms, provisions and stipulations herein contained shall apply to and bind the lessor and the lessee, their heirs, executors, legal representatives and assigns and any transfer of said lease shall be binding in all its terms and conditions on the assignee or transferees thereof, as well as upon the original parties thereto.

"Witness our hands in duplicate originals this 12th day of February, 1916.

"[Signed]                    V. M. Duke.
                             "H. R. Duke.
                          . "John S. Stewart."

On the 9th day of September, 1916, Stewart and Briant subleased 16 acres of the land conveyed to them under the original lease to B. F. Boyles. On the 15th of October, 1916, Boyles assigned a lease to H. T. Straiti, who, on the 8th day of January, 1917, assigned a half interest to E. F. Simms. Appellants make the following statement as to the development of the 16 acres:

"Here is what Straiti-Simms or E. F. Simms & Co. did towards developing the 16 acres: The only well on the entire tract which produc-ed oil was the one put down by Simms on the 16 acres. This well was completed in February, 1917, and produced oil until June, 1919. No other well was put down on the 16 acres; one was started, but never finished. Duke received a little over $200 per month while the well produced. In June, 1919, the well was plugged, and has produced nothing since."

We also adopt their statement of the development of the balance of the land covered by the original lease, to wit:

"On September 29, 1916, Stewart and Briant assigned to the Magnolia Petroleum Company 102.8 acres, out of the lands leased by Duke to Stewart. Here is what the Magnolia Company did to develop the 102.8 acres: They started to drill, and lost their first well. They produced no oil, and moved everything off. They quit drilling and gave up the well, as Duke said, 'I think, in April, 1917,' but were a couple of months moving their stuff. They moved everything except the houses, which they sold later, leaving nothing on the ground. They did nothing more towards developing that .102 . acres. Duke complained to them time and time again about it. On January 27, 1919, nearly two years after the company had abandoned the property, it made an assignment of 25 acres off the south end of the 102.8-acre tract to J. W. Oliver, which tract subsequently was assigned to the Texas Pure Oil Refining Company, , and it tried to make a well, but produced nothing. Duke did not object to the latter company trying to make a well, 'as he wanted production,' hence on the trial, plaintiffs admitted an estoppel as to the Texas Pure Oil Refining Company, and the judgment might be entered in its favor as to said 25 acres."

Plaintiff V. M. Duke testified:

"On the 12th day of February, 1916, myself and wife leased to John Stewart 126 acres, less 5 acres on which we reside and 10 acres known as the Morgan tract, lands located on the creek in the Scott league. The land is marked in red on the map. In the vicinity of my lane the Gaillard property is supposed to be oil land; they have got oil on it. It joins me on the south. . That is the land that Gaillard sold for a large amount of money. There are other producing oil wells in the vicinity of my land. The West Virginia lands are part of the Isenhour tract. I saw that well producing oil, and it was a fine well, running a big stream, located about a fourth of a mile from my land. There are producing wells of the Busch 20 acres, which is further off from my land. I should say half or three-quarters of a mile away. There are several wells on this tract. They have produced very well, but I do not know the amount they have produced. There was only one well put down on the land I leased to Stewart which produced oil, which is the well Simms put down on the 16 acres. That well was completed about January or February, 1917, and then I begun to get a royalty from it, and it continued to produce until June, 1919. There was no other well put down on that 16 acres. I have received no production since June, 1919.

"As to the 102 acres subleased by Stewart to the Magnolia Petroleum Company, they started to drill, and lost their first well. Then got an extension, and drilled a second well. They pro-

duced no oil, and moved everything off. They quit drilling, and gave up the well, I think, in April, 1917, but were a couple of months moving their stuff. They moved everything except the houses, which they sold later, leaving nothing on the ground. They did nothing more towards developing that 102 acres. I complained to them time and time again about it.

"The Magnolia Petroleum Company assigned and transferred to J. W. Oliver 25 acres, dated the 27th day of January, 1919, which is the south 25 acres of the 102 acres which Stewart and Briant leased to Magnolia Petroleum Company, and in which J. W. Oliver transferred his interest to F. E. Creale, who transferred the same to the Texas Pure Oil Refining Company.

"There was only one well put down on the land I leased to Stewart that produced oil, and that is the one Simms put down, and it was down here (indicating on the map) at the lower corner. That well was completed in February, 1917, and I then begun to get royalty on it. It continued to produce until June, 1919. There was no other well put down on that 16 acres by Straiti or Straiti and Simms. They started another well and gave it up. I have received no production whatever since June, 1919.

"Offhand I cannot tell you what the Simms and Straiti well produced. My royalty was one-eighth, and I think from the time it begun until it ceased that it ran a little over $200 per month; would average $200. Stewart and Briant paid me $100 per month for the first year; they were not drilling during that time, and had no production. There were wells in Goose creek at the time I leased to John Stewart, and oil found there, but not like it is now, or soon afterwards. There were a number of wells there in June, the latter part, and possible it ran into July. They were working down there, doing something, working with their engine on the well, and I was told that they were trying to bring it back, but they never did, and finally they plugged it up and left it. I am referring to the Straiti and Simms well.

"They offered to pay me $100 per month, and I refused to take it because I thought if they paid me $100 per month and I accepted it they would go on eternally, and that is all I would get. As long as the well had been paying me over $200 per month, I did not want to take $100, and I have got nothing since. I sought advice as to my rights as to the several subleases with reference to abandonment, that they could be separated and could be canceled by abandonment, and that each stood upon its own facts. I leased the land for the purposes of production, and after I leased it tried to get them to develop it. Briant and Stewart together prepared the original lease. Stewart and Briant drew the contract up, and Stewart came down to us with a notary, and myself and wife signed it."

### O. C. Hohl testified in substance:

"I am a warehouse foreman for the Oil Well Supply Company; have worked in the oil field and worked at Goose creek; was sent to Goose creek by Simms and Straiti about the 26th of August, about the time the discovery well came in of the American Production Company about 1917, I think. I continued in the field until June 1, 1918,. I was there about 19 months, I think, at first; know the location of Mr. Duke's land, and worked on that lease about 18 months, on the Simms-Straiti Well Nos. 1 and 2. I cannot tell you exactly when we begun work on that rig. That well came in about February 17, 1917. It came in a producing well, don't know when it quit producing; I only know what it produced by estimates, standing there and watching it. I do not know what is or what is not oil property in the Goose creek field. I was 18 months at Goose creek as a helper, and then in charge of the production for Simms-Straiti on the Duke lease until the 15th of December. Duke No. 1 was pumping when I left there. Duke No. 1 was drilled about 100 feet from the Producers' Oil Company line. After finishing No. 1, I put tanks in and moved around here and set the rig; where the Simms-Straiti No. 2 was started. No. 2 was never finished. I don't know anything about the Magnolia Petroleum Company, was only there twice. The nearest producing well to Duke No. 1 was right over across the creek; it was a flowing well; the next nearest producing well was the American Discovery well, which was about 4,200 feet distance. I know where the West Virginia well is located; it was right on the bank of the creek. I don't know whether that is the one on the map; they junked one of them. It was a good flowing well. I would estimate its production to be 5,000 or 6,000 barrels. I have seen that well, and it is a large producing well and flowing. They put down several wells in the Isenhour tract, and those along the creek there were producing wells. A portion of the Goose creek field is developed all up the bay front. The Gaillard lease straight on out to the Murphy place, the wells there are 100 to 200 feet apart; that is the way I have seen them put down on small leases. The Gaillard lands, which are a valuable portion of the Goose creek field, adjoins the Duke lands. When I left there only a part of the Gaillard lands were developed, and at that time there were about 35 or 40 wells on the Gaillard land on the Gulf and Humble leases—I do not know the number of acres."

### Henry Busch, in substance, testified:

"I live between the Goose creek field and Cedar bayou, about two miles from Goose creek. I have lands which are a part of Goose creek oil field. My land is about 200 to 250 yards northeast of Duke's land. Ten wells have been bored on my land, and they found oil in every one of them. My tract is 20 acres. I know the Straiti-Simms well on the 16 acres leased of Duke, which is the well close to the lake and country road. It is a producing well. It was a producing well for a considerable length of time, but is not producing now, being plugged up. Have been by it since it was plugged with a big wooden plug driven down into it, and oil was oozing from around the plug as if it wants to ooze out around the edges of the plug. I think it was in June, 1919, that it was plugged. I know the location of the 102 acres that the Magnolia Petroleum Company got by sublease or assignment from John Stewart and Briant. Don't know whether anything is being produced on it or not. Have not been on the land lately. Passed the well several times, and it was not producing. I know where the well was put down by the Texas Pure Oil Company on the 25 acres to the south of the 102 acres lease.

"I am in the center of the main part of the Goose creek field, on the edge of it, and runs to the center. The main operations of the field going on is south of me, southeast and west. Very few producing wells to the north of me. A part of Mr. Duke's tract of 125 acres lays on a northeast or northerly direction; the 16 acres lay northwest, and the 109 acres lay north, I think."

I. Isenhour testified, in substance, as follows:

"I live at Goose creek, and am acquainted· with Mr. Duke's 125 acres. The home on which he resides is at Goose creek. I have lands in the Goose creek field, and our lands are on the west of Goose creek and to the south of Duke's lands. My land adjoins his land on one side; the creek is between them. My lands have been leased for oil production since 1917. I leased to the Producers' Oil Company or Texas Oil Company. My tract is about 300 acres; development started on my tract about October, 1917, they have bored 16 or 17 wells on my land since they began in 1917. Oil has been and is being produced on my land, and just one company has developed it. There are 3 wells being pumped on my land out of 16, which is in a southeast direction, closer to the central part of the oil field. There are developments and production going on as far north as Duke's land, and a distance of about a half mile east of Duke's land. I suppose Duke's land is about a mile from the center of the producing oil field."

On the 13th day of September, 1919, when appellants filed their suit, the Texas Pure Oil & Refining Company was trying to develop the 16 acres held by it. The trial court instructed a verdict for appellees.

Appellants contend that the facts are sufficient to raise the issue of forfeiture or abandonment against all the appellees except the Texas Pure Oil & Refining Company, on the ground that they failed "to develop with reasonable diligence for the production of oil and gas," or failed "to· continue development with reasonable diligence for production of· oil and gas." Their position is well stated in the following special charge requested by them and refused by the court, which is made the basis of their third assignment of error:

"Gentlemen of the jury, at the request of plaintiffs you are charged that it was the duty of each defendant herein to develop the lands assigned and subleased to him, with reasonable diligence, for the production of oil and gas, and if you find from the evidence that the defendant, or either of them, did not so develop the portion claimed by him for oil and gas with reasonable diligence, then you should find against such defendant or defendants, on the ground of abandonment. Let your verdict answer this issue as to each defendant separately."

We cannot agree with this construction of the original lease. McCallister v. Texas Co., 223 S. W. 859; Fisher v. Crescent Oil Co., 178 S. W. 907; South Penn Oil Co. v. Snodgrass, 71 W. Va. 438, 76 S. E. 963, 43 L. R. A. (N. S.) 848; Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396; Munsey v. Marnet Oil & Gas Co., 199 S. W. 686; Corsicana Pet. Co. v. Owens, 110 Tex. 568, 222 S. W. 54; Decker v. Kirlicks, 110 Tex. 90, 216 S. W. 385; Young v. Jones, 222 S. W. 691.

Appellants leased their land as an entirety to John S. Stewart. He assumed an obligation to develop this land or have it developed, according to the terms of this lease. He did not agree to develop or have developed any particular acre or any particular tract. The development by Simms and Straiti was under the terms of the original lease. It was of no concern to appellants how Stewart paid for the development, nor who did the developing. The right to sublease was granted him, and he could pay for this development by transferring to others a portion of his interest in the original lease. As the sublessees held under him, he was a privy to their development, and the work done by Simms, and Straiti accrued to his benefit and to the benefit of his assigns as to the balance of the tract. We approve appellees' counter proposition as to a correct statement of the law of this case:

"Where an owner of a tract of land executed a lease to another as an entirety, developments by a sublessee of a part of the tract would constitute operations by the original lessee, and the owner of the fee may not forfeit the lease in part only while it was valid as to the remainder."

The Texas Pure Oil & Refining Company were holding and developing under the terms of the original lease. Appellants did not protest against their efforts to develop the 25 acres held by them, but conceded in the trial of the case that they were estopped to urge forfeiture or abandonment as to them. Development by this defendant, being under the lease under which all of the defendants held, was for their joint benefit, and saved the lease from loss by forfeiture or abandonment.

On the facts before it, the trial court properly instructed a verdict for defendants, and this judgment is affirmed without prejudice as to the rights of appellants or their assigns to bring a new suit, or suits, should the holders under this original lease fail to perform the obligations imposed upon them by this contract. Fisher v. Crescent Oil Co., supra.

Affirmed.