HUGHES v. CORDELL.

Opinion delivered July 11, 1927.

1. ABANDONMENT—INTENT.—To constitute forfeiture of an oil and gas lease by ceasing operations, the relinquishment must be actual and the abandonment intentional, and such matters are questions of fact.

2. MINES AND MINERALS—ABANDONMENT OF LEASE.—Under the facts established, *held* that a finding that there was no abandonment of an oil lease cannot be said to be clearly against the evidence.

3. MINES AND MINERALS—FORFEITURE OF LEASE FOR NONDEVELOPMENT.—Where an oil lease of a tract contemplated for development of it in its entirety, the lessor cannot forfeit a part of his for nondevelopment where the rest has been developed.

4. REFORMATION OF INSTRUMENT—INTENTION OF PARTIES.—A deed conveying an undivided one-eighth interest in the oil, gas and minerals in certain lands, with a right to collect a fractional part of the royalties under the lease, *held* properly reformed as to the interest in the royalty conveyed to conform to the mutual intention of the parties.

Appeal from Ouachita Chancery Court, First Division; *J. Y. Stevens,* Chancellor; affirmed.

*George W. Hays, Allyn Smith* and *Morris Few,* for appellant.

*Neil C. Marsh* and *Gaughan & Sifford,* for appellee.

WOOD, J. The facts of this case are correctly stated by counsel for the appellees as follows:

"On February 16, 1920, George Flannagan executed an oil and gas lease to R. V. M. Cordell, describing therein lot 1 in the northeast quarter and lot 1 in the northwest quarter of section 6, township 16 south, range 15 west, containing 90.26 acres. In form, the lease is an ordinary oil and gas lease, containing only the usual provisions relating to the payment of royalty and the development of the land. There is no provision in the lease for a forfeiture for failure to develop.

"The lease was afterward subdivided by R. V. M. Cordell, the Humble Oil Refining Company acquiring lot 1 in the northeast quarter of section 6, containing approximately 50 acres, the Sinclair Oil & Gas Company acquiring the west 30 acres of lot 1, in the northeast quarter of

section 6, and the remaining 16 acres off the east side of lot 1 in the northwest quarter of section 6 was retained by R. V. M. Cordell. It is this 16 acres that is in controversy in this suit.

"On September 27, 1922, R. V. M. Cordell contracted for the drilling of this 16-acre tract, Cordell retaining a 7-32 overriding interest in the oil production. The 16-acre tract was further subdivided, and drilling commenced. The first well came in on January 14, 1923. Seven wells were drilled by five different operators, who had acquired separate distinct parts of the 16-acre tract. These wells were drilled to the first producing sand, which began to fail and show considerable salt water after about three months. As these wells failed, the machinery was moved off and some of the casing pulled.

"During the fall of 1923 and the winter and spring of 1924 this lease was submerged by Smackover Creek. During 1923 and 1924 Miss Alice Cordell, who had an interest in the royalty, and her brother, R. V. M. Cordell, who had an interest in the leasehold, visited the lease on several occasions, and found water standing on the lease every time. They were trying to get some one to drill the property, as they had no drilling rig of their own. After production failed on the 16-acre tract, the title to the leasehold was outstanding in numerous individuals and companies, some of which were involved in litigation, and, in order to secure some operator who would accept the title and operate the property, it was necessary to acquire all of these outstanding interests. This Miss Alice Cordell undertook to do. It required at least fourteen deeds and assignments and affidavits to get the outstanding title back into one individual. This was finally accomplished by September, 1925. In the meantime the Superior Oil Company had agreed to buy the lease if the outstanding titles could be secured, and a number of conveyances and assignments were executed by Alice Cordell transferring the title to the several tracts to the Superior Oil Company.

"Just prior to November 6, 1925, the Superior Oil Company commenced drilling its first well. The contract price for this well was $14,500. This well was commenced before any objection was made by Dr. Hughes, and, according to Robert Tate and C. O. Tate, before they had any intimation that Dr. Hughes or any one else claimed that the lease had been forfeited for abandonment. This suit was not filed until after the second well was started by the Superior Oil Company.

"The lease cost the Superior Oil Company $16,600, and it has drilled three wells on the lease. L. C. Peters, production superintendent for the Humble Oil Refining Company, testified concerning the wells drilled on lot 1 in the northeast quarter of section 6, which was held under the same lease as the 16-acre tract acquired by the Superior Oil Company. Five wells were drilled in 1923 to the first sand. Well No. 5 was deepened to the second sand in May, 1925, and wells Nos. 6, 7 and 8 were drilled to the second sand. Well No. 6 was later deepened to the third sand. The second sand was discovered about March, 1925."

Mr. Stephenson, of the Sinclair Oil & Gas Company, testified that seven wells had been drilled on the west 30 acres of lot 1 in the northwest quarter of section 6, and two were drilling at the time he testified. The first well was drilled in December, 1922. Six wells were completed in January, 1923. There are three first sand wells still producing.

The following stipulation was made in open court and entered of record: "It is admitted that lot 1, in the northeast quarter of section 6-16-15, which is described in the lease executed by George Flannagan to R. V. M. Cordell, came into possession of Humble Oil Refining Company by assignments, and that the Humble Oil & Refining Company entered this land and drilled the same and commenced producing oil on the 7th of January, 1923, therefrom, and have been continuously engaged in producing oil from the same at all times since that date; and it is admitted that the west 30 acres of lot 1 in the northwest

quarter of section 6-16-15, in so far as the lease of Flannagan to Cordell affected the same, was assigned to the Sinclair Oil & Gas Company; that it drilled a well thereon in December, 1922, and began producing oil therefrom on the 23d day of December, 1922, and has been continuously producing oil from said west 30 acres of lot 1 in the northwest quarter of said section, ever since the 22d day of December, 1922, and that this production and all their operations have been carried on under the terms and by virtue of assignments of parts of the acreage covered in the original lease from Flannagan to Cordell.''

Dr. Hughes became connected with this property when he secured a power of attorney from George Flannagan, May 28, 1923. The power of attorney was revoked June 8, 1923. Flannagan again appointed J. F. Hughes his attorney in fact on July 24, 1923. This power of attorney was revoked on September 14, 1923. Thereafter, on September 15, 1923, Flannagan appointed Frank Betts as his attorney in fact. It does not appear that Dr. Hughes was ever again appointed attorney in fact for Flannagan.

On April 14, 1924, Flannagan conveyed the fee simple title to this tract to G. F. Hughes, daughter of J. F. Hughes. On August 31, 1925, G. F. Hughes conveyed the land to Dr. J. F. Hughes. Prior to the conveyance by Flannagan to G. F. Hughes, he had sold undivided interests in the oil, gas and minerals on this land as follows:

On September 28, 1922, to Alice Cordell, an undivided one-eighth interest in the oil, gas and minerals. On September 30, 1922, to Eula Greer, an undivided one-half interest in the oil, gas and minerals. On September 30, 1922, to Texas Leasing Corporation, an undivided one-eighth interest in the oil, gas and minerals. On December 20, 1922, to Alice Cordell, trustee, and G. Gillespie, trustee, an undivided one-eighth interest in the oil, gas and minerals.

By these deeds Flannagan conveyed 7/8 undivided interest in all the oil, gas and minerals in this land, subject to the outstanding oil and gas lease previously

granted to R. V. Cordell. Flannagan therefore had only an undivided one-eighth interest in the oil, gas and minerals left at the time he conveyed the land to G. F. Hughes. On November 6, 1925, J. F. Hughes conveyed to Superior Oil Company an undivided one-eighth interest in the oil, gas and minerals, subject to the lease to R. V. M. Cordell. This conveyance left J. F. Hughes with the bare fee simple title to the land, with no interest in the oil, gas and minerals at the time this suit was brought.

This action was begun on November 28, 1925, in the Ouachita Chancery Court by J. F. Hughes against Alice Cordell, trustee, and the Superior Oil Company, a corporation, to cancel a mineral, oil and gas lease held by Alice Cordell, trustee, and the Superior Oil Company on sixteen and two-fifths acres of land covered by original mineral, oil and gas lease from George Flannagan to R. V. M. Cordell. The complaint alleged title to the land in the plaintiff through mesne conveyances from Flannagan, and that the leases on the lands in controversy had been abandoned, and that, after their abandonment, the plaintiff took possession for more than a year when the Superior Oil Company acquired and was attempting to hold possession of the land that was unlawful and in excess of the rights he had obtained under a surface lease for a pick-up station. The plaintiff alleged that the leases in controversy were a cloud on his title, and prayed that the same be canceled, and that he be awarded a writ of possession.

The defendants, in their answer, denied the allegations of the complaint as to abandonment, and alleged that they were the owners and in lawful possession of the property under leases from R. V. M. Cordell, the original lessee of the property from Flannagan. The defendant, Superior Oil Company, alleged that there was an error in the deed from Hughes to it, in that the deed specified one sixty-fourth royalty when it should specify one-eighth, and prayed that the deed be reformed so as to effectuate the intention of the parties.

The above are the issues and facts upon which the trial court found that there was no abandonment, and therefore no forfeiture of the lease in controversy, and that the same was in full force and effect; and further, that there had been a mutual mistake in the mineral deed from J. F. Hughes to the Superior Oil Company of date November 6, 1925, in describing the royalty interest conveyed; that it was the mutual intention of the parties to convey one-eighth of the royalty interest instead of one sixty-fourth. The court therefore granted the prayer of the Superior Oil Company that the deed be reformed accordingly. The court entered a decree in accordance with its findings, from which is this appeal.

1. The first question presented is one of fact as to whether there had been an actual abandonment of the lease in controversy. As to whether or not there has been an abandonment, as a matter of fact, in any given case, is largely a question of intent to be determined, to be sure, by the conduct of the party charged with the abandonment. As is said in *Cadillac Oil & Gas Co.* v. *Harrison,* 244 S. W. 669, 196 Ky. 290, quoting syllabus: "To constitute the forfeiture of an oil and gas lease by ceasing operations, the relinquishment must be actual and the abandonment intentional, and such questions are questions of fact." See also *McDaniel* v. *Conlan,* 134 Ark. 519, 204 S. W. 850; *Wooten* v. *Farmers' & Merchants' Bank,* 158 Ark. 179, 249 S. W. 569.

It could serve no useful purpose as a precedent to argue purely a question of fact. The facts are set out above, and they speak for themselves. The trial court made a specific finding that there had been no abandonment of the lease in controversy, and certainly it cannot be said from the above facts that such finding is clearly against the preponderance of the evidence.

2. But, if it be conceded that the lease in controversy was in fact abandoned by the sub-lessees, such abandonment by them could not work a forfeiture as against those who claim under R. V. M. Cordell, the original lessee of the lease from the lessor, Flannagan. Learned

counsel for the appellants say in their brief: "The evidence shows that the oil has been produced on the other 39 acres of this lease practically during all the time since the first discovery well. Cordell made assignments of his lease to the land in controversy to two or three parties, and it is as to these segregated portions that a forfeiture is claimed. * * * It is our contention that, when a tract is segregated and assigned, it here becomes a separate lease as between the assignee and the lessor, without affecting the balance of the lease, and we insist that that was done in this case." We cannot concur in the contention of counsel that an abandonment of the segregated and sub-leased land by the sub-lessees would entitle the lessor and owner to have the lease canceled as to such portions. The lease from Flannagan, the original lessor and owner, to Cordell was a lease for the development of the 90 acres in its entirety, and these sub-leases were for the purpose of development. The law in cases of this kind is accurately and succinctly stated in syllabus to *Duke (Tex. Civ. App.)* v. *Stewart,* 230 S. W. 485, as follows:

"Where owner leased land as an entirety and by lease required lessees to develop the land for oil, without providing for development of any particular acre or tract thereof, the development of a portion of the land by a sub-lessee accrued to the benefit of the lessee, precluding the owner from declaring lease forfeited as to another portion held by lessee or successors for nondevelopment thereof." See also *Gypsy Oil Co.* v. *Cover,* 78 Okla. 158, 189 Pac. 540, 11 A. L. R. 129.

The case of *Cox* v. *Sinclair Gulf Oil Co.,* 265 S. W. 196 (Tex. Civ. App.), upon which counsel rely to sustain their contention, as we read it, does not conflict with the doctrine above expressed, but rather sustains the same. In that case the action was by the lessor against all the assignees of segregated portions of the oil lease to cancel the entire lease because of nondevelopment and abandonment. The 16th syllabus to the case is as follows: "On failure of assignee of segregated portion of lease to prop-

erly develop, as required by implied covenants, lessor is entitled to cancel lease of assignee so in default, or entire lease, as to all assignees, where they all rely on development by the one in default to vest in them the right to thereafter drill for oil.'' In the case at bar the action is to cancel the leases only as to the segregated portions sub-leased, and not the entire lease. As between the lessor, Flannagan, and Hughes, who claims title under him, and the original lessee, R. V. M. Cordell, and those claiming under him, such an action will not lie, because there has been development on the tract not segregated and sub-leased, and, under the doctrine above stated, ''the fee owner may not forfeit the lease in part only while it is valid as to the remainder.''

3. The court did not err in reforming the deed executed by Dr. Hughes to the Superior Oil Company. The facts on this issue are as follows: The deed was prepared by C. O. Tate and sent to the Bank of Smackover to be executed, and a voucher for $1,000 was sent to the bank to be delivered when the deed was delivered. The deed as prepared by Tate was in usual form, and in the granting clause conveyed an ''undivided one-eighth interest in and to all oil, gas and other minerals in, under, and upon the following described land, lying in the county of Ouachita and State of Arkansas, to-wit: (Here follows a description of the lands containing the 16 acres in controversy). The deed recited that ''it is subject, however, to a certain oil, gas and mineral lease executed by George W. Flannagan and wife on the 13th day of February, 1920, unto R. V. M. Cordell,'' etc. The deed as originally written granted to the Superior Oil Company the right to collect and receive under the aforementioned lease such undivided ''one-eighth part and interest of all oil royalties and gas rentals due or that might become due under the aforementioned lease.'' The appellant took the deed, and, without the knowledge of the bank, the escrow agent, or the grantee, changed the deed in the last paragraph thereof to read one sixty-fourth instead of one-eighth. The check was indorsed by the

appellant, and he collected the $1,000. The check bore the following notation: "One-eighth oil, gas and minerals on Hughes E½ lot 1, NW¼, 6-16-15." The deed was made pursuant to an escrow agreement whereby appellant agreed to sell to the Superior Oil Company one-eighth of the oil, gas and minerals in, on and under the land described, the same constituting one sixty-fourth royalty on same. The deed was reformed by the trial court to carry out the manifest intention of the parties, which was that the grantor should convey to the grantee one-eighth of the oil, gas and minerals in, on and under the land described, constituting one sixty-fourth royalty on the same, whereas the deed as changed by the appellant would entitle the Superior Oil Company to collect only 1/500 twelfth royalty. Such was not the intention of the parties.

We find no error. The judgment is therefore affirmed.