## COWDEN v. BRODERICK & CALVERT, Inc., et al.

### No. 3540.

Court of Civil Appeals of Texas. El Paso.
June 17, 1937.

On Rehearing July 8, 1937.

Appellant's Motion for Rehearing Denied Sept. 16, 1937.

Oliver W. Fannin and Bryan, Stone, Wade & Agerton, all of Fort Worth, and Whitaker & Perkins, of Midland, for appellant.

Frank Stubbeman, of Midland, and Slay & Simon, of Fort Worth, for appellees.

NEALON, Chief Justice.

By his first amended petition plaintiff (appellant) sued defendants (appellees) seeking that as to 160 acres of land in Ector county a certain oil and gas lease and all rights of defendants thereunder be forfeited; or, in the alternative, for damages for defendants' failure to develop the land for oil and gas; or, in the further alternative, a judgment requiring defendants under penalty of forfeiture of said lease to "at once begin and thereafter continue to reasonably develop said land for oil and gas by the sinking of such further wells and within such time as the court may determine is equitable and reasonable under the circumstances"; and for general and special relief, legal and equitable.

Defendants interposed a general demurrer, which the court sustained. Plaintiff declined to further amend, and the court entered its judgment of dismissal.

From this judgment plaintiff appeals.

For cause of action plaintiff alleged that on June 23, 1933, and at all times thereafter until the filing of the amended original petition, upon which he went to trial, he was the owner of 2,429½ acres of land, more or less, in Ector county, described in said petition; that "on June 23, 1933, plaintiff and one O. C. Harper entered into a written contract by the terms of which the latter agreed, for the consideration hereinafter stated, at his own expense, or that of his assignees, to drill and equip a well for oil at some location on the above described Section" 25—a part of said land.

"Under the terms of the contract he or his assignees agreed to begin the actual drilling of said well on or before August 1, 1933, and with due diligence to continue the drilling operations until a depth of 4500 feet had been reached, or until oil and/or gas were produced in commercially paying quantities in said well (meaning at a lesser depth) or until the well had reached what is known as the sulphur water strata in the 'Big Lime' as the general location thereof was known to the parties from the experience of others in drilling wells in the same general vicinity. The contract stipulated that when the well should have been so drilled to a depth of 4500 feet, or to commercial production of oil and/or gas (meaning a lesser depth), or to sulphur water in the 'Big Lime,' in any such event, and, if the well should be a non-producer and he or his assigns had removed his or their equipment from the premises and had plugged the hole in accordance with the pertinent rules and regulations of the Railway Commission (meaning the Railroad Commission of Texas) and had filled the slush pit and otherwise cleaned up the premises, the said O. C. Harper or his assigns would be considered as having performed his contract to the extent of having earned and being entitled to the consideration moving to him for the drilling of said well, being the delivery to him or them of the oil and gas lease hereinafter referred to. The contract between the parties contains other and further stipulations with respect to certain details, and a substantial copy thereof is attached * * * marked 'Exhibit A,'" and made a part of the pleadings.

"The consideration moving to O. C. Harper and his assigns, as stipulated in the contract, for the performance by him or them of the terms of the contract, was an oil and gas lease from plaintiff covering all of the above described lands. On the date of the contract, and contemporaneously with the execution and delivery thereof, in accordance with a stipulation therein plaintiff, joined by his wife, Ida Fay Cowden, executed and acknowledged an oil and gas lease to O. C. Harper, as lessee, covering all of said lands, prepared on a printed form, which, as stipulated in the contract, was at that time, along with a copy of the contract, delivered to the First National Bank of Midland, as escrow agent for the parties, to be delivered by the escrow agent to O. C. Harper or his assigns if he or they complied with the terms of the contract, in which event it should become in full force and effect.

"The moving and controlling consideration to plaintiff for said contract and said oil and gas lease, and the sole consideration therefor except for the possibility of the relatively unimportant delay rentals that might be paid to him under the terms of the lease, was the hoped-for and expected royalties that would accrue to him under the terms of the lease in the event commercial production of oil or gas were produced from the lands under the terms thereof. No money or other consideration than that mentioned was paid to plaintiff for his execution of either the contract or the lease. Defendants herein, as assignees of O. C. Harper, acquired all of his rights under the contract and under the lease, in and to 160 acres in a square out of the middle of the South one-half of said Section 25; * * * and in consideration thereof, or else in part consideration thereof, and perhaps of other subdivisions of the 2429½ acres of land covered by the lease, defendants agreed with O. C. Harper to drill the test well stipulated for in his contract with plaintiff, and they did in due time drill such well on the above described 160 acre tract, about 440 feet from the South line thereof, about midway between its east and west lines. The well was completed and equipped as a commercial producer of oil on October 25, 1933, since which time it has continued to produce, and defendants have saved therefrom an average of about 60 barrels of oil per day. This production has from the beginning been sold as produced at an average of 75 cents per barrel.

"On completion and equipment of the above described well producing oil in commercial quantities the above mentioned oil and gas lease was delivered by the escrow agent to O. C. Harper as lessee and/or to him and his assigns, as was agreed in the drilling contract, and ever since said time the respective rights, duties and obligations of plaintiff and of the original lessee and of defendants and other assignees of the lessee are evidenced, fixed and controlled exclusively by the lease, the drilling contract having theretofore been completely performed. A copy of the lease is attached hereto. * * *" "This lease contains, among other things, the following stipulations fixing the rights, privileges and obligations of and between plaintiff, as lessor and of the original lessee and

his assigns, including defendants herein as to the 160 acres of land above described;

"(a) The land is 'granted, demised, leased and let * * * unto the said lessee (and his assigns) for the sole and only purpose of mining and operation for oil and gas and of laying pipe lines and of building tanks, power stations and structures thereon to produce, save and take care of said products.'

"(b) 'This lease shall remain in force for a term of five (5) years from this date, and as long thereafter as oil, gas or casing-head gas, or either of them is produced from said land by lessee (and/or his assigns) in commercial quantities.'

"(c) 'In consideration of the premises the said lessee covenants and agrees * * * to deliver to the credit of lessor, free of cost, in the pipeline to which he may connect his well, the equal one-eighth part of all oil produced and saved ·from the premises, * * * to pay to the lessor one-eighth (⅛) of the market value thereof at the mouth of the well for gas from any well where gas is found, while ·the same is being used off the premises, * * * to pay lessor one-eighth (⅛) of the net proceeds derived by lessee from the sale of casinghead gas produced and saved from said leased premises.'

"(d) 'If no well be commenced on said land on or before the 23rd day of June, 1934, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in The First National Bank at Midland, Texas, or its successors, * * * the sum of twelve hundred fourteen and 75/100 ($1214.75) dollars, which shall operate as rental and cover the privilege of deferring the commencement of a well for twelve months from said date. ·In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively. * * *'

"(e) 'In the event of production on adjoining land, lessee agrees to drill proper and necessary offsets along property lines; lessor agrees that all other development shall be at the discretion of the lessee.'

"(f) 'If the estate of either party hereto is assigned—and the privilege of assigning in whole or in part is expressly allowed except as hereinafter limited—the covenants hereof shall extend to their heirs, executors, administrators, successors, or assigns. * * *' "

"As stated, the obligation of lessee or his assigns to drill the test well, as provided in the contract between the parties, was the consideration, in lieu of cash or other thing of value, moving to lessor for his execution and the later delivery of the oil and gas lease, the provisions and stipulations of which alone, after its delivery by the escrow agent, constituted and now constitute and evidence the mutual rights, privileges and obligations of lessor on the one hand and of lessee and his assigns, including defendants, on the other. One of the obligations devolving upon lessee and his assigns, including defendants as the owners of the lease insofar as it applies to said 160 acres of land, was, under the terms of the lease, either to commence a well on or before June 23, 1934, on some portion of the 2429½ acres covered by the lease, or else on or before said date to pay or tender to lessor one year's delay rental in the sum of 50 cents per acre. Plaintiff avers that no well, provided for in the lease itself, was commenced on any part of the 2429½ acres on or before June 23, 1934, and defendants did not pay or tender to plaintiff the 50 cents per acre delay rental on their 160 acres, as provided for in the lease—for which reason plaintiff says that the lease as to said 160 acres and all of the right, title and interest of defendants therein became forfeited, and complete title to said 160 acres of land reverted back to plaintiff immediately after June 23, 1934; and defendants should account to and are indebted to plaintiff for the market value of 75 cents per barrel of ⅞ of the production from said land from that date to date of trial, less actual production costs."

Plaintiff then proceeded to allege that he received no cash or other thing of value for the oil and gas lease, and that lessee acquired the lease by exploring the land for oil by means of the test well; that his sole motive in executing and delivering the lease was the expectation of receiving the stipulated royalties (in the event oil was discovered) "from a reasonable and orderly development of the land for oil and gas through sinking of wells thereon as rapidly as would be consistent with the best practices in the development of land that had proven to contain oil or gas in commercial quantities." Plaintiff, after alleging that after discovery, it was the "legal duty of defendants to continue to reasonably develop the 160 acres" for oil and gas by drilling and equipping other wells thereon, so that plaintiff might enjoy royalties therefrom as

contemplated by the lease, further pleaded, "Plaintiff avers that such reasonable development, under all of the facts and circumstances, having in mind the size of the tract, the depth and location of the discovery well thereon, the settled production of the test well, the market value of the oil, and other existing pertinent facts and conditions, would have required defendants to drill and complete one additional well each three months after October 25, 1933, down to this date and/or until the entire 160 acres were developed or tested for oil or gas in paying quantities. If defendants had discharged their duty to plaintiff in that regard, a second well would have been completed on or before January 25, 1934, a third on or before April 25, 1934, a fourth on or before July 25, 1934, a fifth on or before October 25, 1934, a sixth on or before January 25, 1935, and a seventh well would now be drilling. Plaintiff avers that the schedule of drilling just outlined would have been reasonable development of the property, and that had such wells been drilled each of them would have produced, after completion, a netted production of at least 60 barrels of oil per day, which would have been of an average value and would have sold on the market as produced for 75 cents per barrel, resulting in royalties that plaintiff would and should have received from said property to this date of $6,300, instead of approximately $180 per month from the well now on the land since it was brought into production; and plaintiff says that the breach by defendants of their legal duty to drill the additional wells above mentioned has damaged him in the amount of the royalties he would have received therefrom prior to this date, which would have been $180 per month from each well after it should have been completed as aforesaid, together with interest at the rate of 6 per cent. per annum from the time each such sum of money should have been received by plaintiff.

"Plaintiff further alleges that the provision in said oil and gas lease providing that all development other than the drilling of proper and necessary off-sets along property lines, should be 'at the discretion of the lessee,' does not relieve the lessee of the obligation of reasonably developing said premises for oil and gas, but that under the terms and provisions of said lease, said lessee, and his assigns, were, and are, obligated to reasonably develop the said premises for oil and gas as any reasonably prudent operator would do under the same or similar facts and circumstances; but in the alternative, if it should be found by the court that any development of the premises should be at the sole discretion of the lessee, then plaintiff alleges that defendants have abused, and are abusing, their discretion, and have arbitrarily refused to drill any additional wells on said land, although they knew, and the plaintiff alleges the fact to be, that a reasonable development would have required the number of wells to be drilled within the periods of time hereinabove stated; and that if these defendants had acted in good faith they would have developed said premises by drilling the same number of wells in the time, manner and circumstances heretofore set out, in which event plaintiff would have received additional royalties, as heretofore set out, and because of the failure of defendants to so act in good faith, and by the abuse of this discretion in developing said premises, and in arbitrarily refusing to drill additional wells, plaintiff has been damaged in the amount of sixty-three hundred and no/100 ($6300.00) dollars, together with six per cent. interest thereon, as above alleged."

" * * * In this connection plaintiff avers that, in view of this long delay in sinking further wells, such reasonable development in the future would require the immediate beginning of operations for the sinking of two additional wells on said 160-acre tract and the drilling thereof with reasonable diligence to the required depth, a reasonable time for the completion and equipment thereof being three months following the entering of judgment herein, and would require that two additional wells be so commenced and completed, and equipped on the land during each three months' period thereafter until the tract is completely developed by the sinking of at least one well to each ten acres thereof, or is at least reasonably explored and tested for oil and gas; and plaintiff prays that the decree provide for such development, and that failure of defendants to comply with the terms of such decree in that regard shall result in forfeiture of the lease and of all of defendants' rights thereunder."

The escrow contract recited the execution, as of June 23, 1933, of an oil and gas lease from Elliott F. Cowden to O. C. Harper and its deposit in escrow in the First National Bank of Midland, Tex., for delivery as provided in the escrow agreement.

It contained the following provisions pertinent to this controversy:

"2. As consideration for and in payment for the said lease, the second party (O. C. Harper) agrees and covenants with first party as follows, towit:

"(a) That he will at his own proper cost, charges and expense, drill a well for oil and gas at some location on the ——— of Section Number 25, in Block 44, Tsp. 2-South, Texas & Pacific Railway Company Original Grantee in Ector County, Texas, included in the lease above referred to.

"(b) That he will begin actual drilling on the said land on or before August 1, 1933, and this provision is construed to mean actual drilling and not preparation for drilling.

"(c) That he will pursue the said drilling operations after it is begun, with due diligence, considering the surrounding circumstances, until a depth of 4500 feet has been attained, or until oil and/or gas is produced in commercial paying quantities in said well, or until he has reached what is known as the sulphur water strata in the 'Big Lime', and this well shall not mean the first or original strata of sulphur water in the 'Big Lime' as experienced in other wells in the same vicinity, but shall be the sulphur water strata, which in other wells, has been capable of filling the well with sulphur water. The attainment of either result mentioned in this paragraph shall be deemed to be a completion on the part of the second party.

"(d) In the event that the hole is finished as a non-producer under either alternative above mentioned, second party agrees that he will remove all of his equipment and appurtenances from the premises, and that he will plug the hole in accordance with the rules and regulations of the Railway Commission and the law governing that subject, and will clean up the place, and this shall be held to mean the filling up of the slush pit in use in connection with the drilling of the well.

"(e) That he will furnish to the first party upon his request at any time during the drilling of said well, all information which may be obtained by the drilling with reference to the log and the subsurface geology.

"(f) That the said well shall be drilled at the cost and expense of the second party, and shall be so done as not to encumber any interest of first party in the said premises with mechanic's, materialman's or laborer's liens or any other lien that might be fixed thereon.

"3. That the said well shall be drilled in a workmanlike manner and with due diligence and completed as aforesaid. * * *

"7. The consideration moving from each of the parties to the other is the mutual agreements herein contained which in each of said agreements and covenants is a material part of this consideration for the contract and the execution and delivery in escrow of the lease, with a copy of this contract as herein provided."

Portions of the oil and gas lease having a bearing upon the issues on this appeal read as follows:

"It is agreed that this lease shall remain in force for a term of five years from this date, and as long thereafter as oil, gas or casinghead gas, or either of them is produced from said land by lessee in commercial quantities. * * *

"If no well be commenced on said land on or before the 23rd day of June, 1934, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the First National Bank at Midland, Texas, or its successors, which shall continue as the depository, regardless of changes in the ownership of said land, the sum of Twelve Hundred Fourteen and 75/100 ($1214.75) Dollars, which shall operate as rental and cover the privilege of deferring the commencement of a well for twelve months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred.

"Should the first well drilled on the above described land be a dry hole, then and in that event, if a second well is not commenced on said land, before the next ensuing date for the payment of rentals thereafter, this lease shall terminate as to both parties, unless the lessee on or before such next ensuing date for the payments of rentals shall resume the payment of rentals in the same amount and in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payments of rentals, as above provided, that the last pre-

ceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments. In the event of production on adjoining land, the lessee agrees to drill proper and necessary offsets along property lines; lessor agrees that all other development shall be at the discretion of the lessee."

### Opinion.

Appellant contends that the well referred to in the escrow contract was a "bonus" well, and the consideration for the execution and delivery of the oil and gas lease; and that the lease obligated Harper and his assigns to drill a second well which should be begun on or before June 23, 1934, unless on or before that day the lessee should pay the sum specified for the privilege of deferring the commencement of a well. He contends that Harper's assigns breached the lease contract by their failure to drill the second well or pay the stipulated rentals. Appellees contend that the drilling of the test well provided for in the escrow agreement was complete performance of the obligation to drill contained in the lease, and, that, therefore, appellant is entitled to neither forfeiture, cancellation, damages, or a judgment requiring further drilling operations.

■ If possible, we must arrive at the intention of the parties from the language they used to express it. In paragraph 2 of the escrow contract Harper agreed that "as consideration for and in payment for the said lease," he would drill a well. In subsection b of said paragraph he contracted to begin actual drilling of the well on or before August 1, 1933, and it was agreed in emphatic terms that this provision "is construed to mean actual drilling and not preparation for drilling." The lease was not to become effective until this well should be completed. The lease provided that a well should be begun on the land on or before the 23d day of June, 1934, unless the delay rentals should be paid. Can it be said that a well to be begun not later than August 1, 1933, is the same well as the one to be begun not later than June 23, 1934? This is what we must hold if we accept appellees' theory. Again, can it be said that a well which must be begun within six weeks after the lease is signed and deposited in escrow and which must be completed before the lease may become effective by delivery is the well contemplated by the lease, which, as yet has no life? It is our duty to give effect to all of the provisions of the contract, if possible. There is no inconsistency in contracting for a test well to be completed before a lease becomes effective and also providing in the lease for a second well to be commenced within ten months after the signing of the two instruments. This interpretation of the whole contract embodied in the escrow agreement and the lease is necessary if we are to give effect to all provisions of the two instruments, and it is in harmony with the granting of a lease for the "sole and only purpose of mining and operating for oil and gas," etc. We, therefore, hold that appellees, in addition to being under the obligation of commencing and completing the well provided for in the escrow agreement, were obligated to commence a second well on or before June 23, 1934, or pay the contract consideration for the privilege of deferring the drilling. Plaintiff alleged breach of the contract in these respects and resultant damages. These allegations stated a cause of action.

■ Reference to the summary of pleadings hereinbefore made will disclose that in the paragraph stating lessee's obligation to drill offsets in the event of production on adjoining land, this language is used, "lessor agrees that all other development shall be at the discretion of the lessee." Appellee contends that the use of this language eliminates the obligation to reasonably develop the land that is usually implied, and that the word "discretion" as used in the lease is synonymous with the word option, citing Ralph v. Magnolia Petroleum Co., 95 S.W.(2d) 222, 231 (decided by this court) as being directly in point. With this view we cannot agree. In that case the lessee paid $25,000 as a consideration for the lease. It was expressly contracted that the lessee should never be under any obligation to mine, or drill, the language of the lease being, "It is understood that Magnolia Petroleum Company its successors or assigns, shall never be required to nor shall it ever be under obligation to drill or mine for such oil, gas or other minerals and that any mining or drilling at any time hereafter both before or after production, shall be wholly at the option of grantee."

The lease contained this further stipulation: "It is further understood that the consideration and down cash payment hereinabove recited is adequate with and commensurate with and covers all rights and privileges herein granted and conveyed, conditional or unconditional." With respect to

these two stipulations, Justice Higgins, speaking for the court, said, "The last stipulation precludes any supposition that the royalty to be paid constituted the principal and fundamental consideration for Skinner's conveyance. And the first stipulation precludes the implication of any covenant or obligation to explore for, develop, and produce the minerals, if any, in the land." This language of the court has reference to the stipulation that the lessee, its successors or assigns "shall never be required to drill or mine for such oil, gas or minerals * * *" a stipulation quite different from the provision under review.

Appellees also cite in support of their proposition the case of Greenwood & Tyrrell v. Helm (Tex.Civ.App.) 264 S.W. 221. While the terms of the lease are not set out in the opinion, sufficient of the purport is stated to demonstrate that that case is not applicable to the state of facts alleged by appellant. We quote from the opinion: "These leases were not in the usual form of such instruments. They simply conveyed to the lessee the exclusive right to drill and operate for oil, gas, or other minerals in the land, and 'to make as many attempts, if and as lessee shall desire, to find oil or gas in paying quantities on, in, or under said premises,' 'provided,' in one of the instruments, 'lessees have begun operations in any such attempt within sixty days from this date,' and in the other, that 'lessee may begin operation in any such attempt at any time within four years from May 15, 1917.' The forfeiture clause in the lease is, 'and if such operations shall not be begun on or before the expiration of' sixty days in one case and by May 15, 1921, in the other, 'this lease shall wholly terminate; provided if prior to such termination said lessee shall have begun operations in an attempt to find oil or gas, then lessees shall have the right to continue such attempt with reasonable diligence, as also to make as many additional attempts to find oil or gas in paying quantities as lessees please.'" Commenting upon the language of the instrument, the court said, "It may as well be said, at once, that in our opinion the original leases imposed no obligation whatever upon the lessees to exercise their option and drill the land. By express provisions the lessees were given the right merely 'to make as many attempts if and as lessee shall desire to find oil or gas in paying quantities, on, in, or under said premises.'" We can find in these decisions no justifica-

tion for the view that in the instrument being considered the words "all other development shall be at the discretion of the lessee" absolve the lessee from the duty of further development that would have devolved upon it had this language been omitted. Rather, we think that it is a recognition of the existence of that obligation, and its effect is to change merely the standard by which the performance of said duty shall be measured. Had not this or a similar contractual modification of the test of lessee's diligence been provided, the duty would have rested upon lessee "to exercise reasonable diligence to continue drilling and mining operations on the land after oil was encountered in the first well" drilled under the lease. Grubb v. McAfee, 109 Tex. 527, 531, 212 S.W. 464, 465.

As said by the Supreme Court in Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.(2d) 1031, at page 1036, 60 A. L.R. 936: "The Supreme Court of Texas has never approved the view, prevailing in some jurisdictions, that the lessee's judgment, exercised in good faith, is conclusive on whether the lessee has performed the obligations, expressed or implied in the usual oil or gas lease, relative to oil or gas production and protection. In Grubb v. McAfee, 109 Tex. [527], 531, 212 S.W. [464] 465, the conclusion of the Commission of Appeals was declared to be correct 'that the law implied the obligation from defendant in error to exercise reasonable diligence to continue drilling and mining operations on the land after oil was encountered in the first well.'" We think the effect of the language being considered is to make conclusive appellee's judgment when exercised in good faith after due investigation. "Discretion," as the word is here used, means that appellee has "freedom to act according to its honest judgment." It is not a discretion to be exercised arbitrarily or capriciously. Ridgway v. City of Fort Worth (Tex.Civ.App.) 243 S.W. 740. It calls for the exercise of deliberate judgment. As said by the Commission of Appeals when discussing a similar grant of authority in Senter v. Dixie Motor Coach Corporation, 97 S.W. (2d) 945, 947, "The authority * * * to judge in this respect calls for sound discretion involving good faith and due investigation." See, also, Dixie Oil Co. v. McBurnett (Tex.Com.App.) 6 S.W.(2d) 83, holding by necessary implication that when a contract to purchase realty is subject

to approval of title by purchaser's attorney, vendor is entitled to specific performance upon pleading and proving that the rejection was not in good faith. The same doctrine is enunciated in Giles v. Union Land Co. (Tex.Civ.App.) 196 S.W. 312.

Plaintiff alleged that defendants had abused and were abusing their discretion and had failed to act in good faith in the matter of developing the property, setting up in his pleading a statement of what he alleged reasonable development would require, and further alleging that defendants knew that reasonable development would have required the drilling of the number of wells alleged within the time alleged, and that had defendants acted in good faith, they would have developed the premises by drilling the same number of wells in the time, manner, and circumstances set out in plaintiff's amended original petition, and that failure to do so damaged plaintiff in the sum of $6,300.

Prayers for appropriate relief were made as to each count. We think that plaintiff's amended original petition was sufficient in the particulars discussed, and that the trial court erred in sustaining the general demurrer, and exceptions 1 and 2. Benavides v. Hunt, 79 Tex. 383, 15 S.W. 396; W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.(2d) 27; Ryan v. Kent (Tex.Com.App.) 36 S.W.(2d) 1007.

What we have said is not to be construed as approving that portion of plaintiff's amended original petition that alleged that it was the duty of Harper and his assigns to drill additional wells prior to June 23, 1934, nor as holding that they could not have deferred the drilling of such additional wells by paying timely the contract consideration for that privilege.

Judgment is reversed, and the cause remanded.

### On Rehearing.

█ In our former opinion we held it was necessary for lessees (appellees) to drill a second well on or before June 23, 1934, or pay delay rentals. This holding should have been qualified by a statement that this was not an outright obligation, but was necessary if lessees desired to prevent termination of the lease. However, upon consideration of appellees' motion for rehearing it occurs to us that, while as an abstract proposition, this would be a correct interpretation of the lease, yet under certain pleaded facts this holding states an incorrect measure of appellees' duties at

this stage of the transaction. While the escrow agreement obligated appellees to drill a test well as a condition precedent to their right to the lease, and provided certain other duties in the event oil were not secured, it did not obligate lessees to continue to operate said well after its completion, unless such obligation arose out of the agreement to commence drilling not later than June 23, 1934. The pleadings of appellant were to the effect that the well drilled under the escrow agreement was a "producer" and that appellant received $180 per month out of his royalties from its production. This amounted to considerably more than the contract rentals to be paid for the privilege of deferring drilling. Appellant, having accepted these benefits, must be held to have accepted this production in lieu of such as might have resulted from the first well called for by the lease. We, therefore, withdraw so much of our opinion as held the trial court to be in error in sustaining the demurrer to the first alleged cause of action.

Necessarily the trial court was correct in sustaining the demurrer to the second count of the amended petition, if our views are correct as to appellees' duty as to "further development."

In other respects the opinion expresses the view of the court, and, except as indicated herein, appellees' motion for rehearing is overruled.

### On Appellant's Motion for Rehearing.

Appellant in his motion for rehearing discloses a failure to comprehend the effect of this court's holdings upon appellees' motion for rehearing. To prevent misunderstanding we restate them in different language:

First. We hold that the trial court did not err in sustaining a demurrer to the first count of plaintiff's amended petition.

Second. We hold that the alleged cause of action based alone upon alleged failure after discovery to reasonably develop for oil and gas was subject to demurrer. The original opinion states our conception of appellees' duty as to further development— a mere failure to further develop not being actionable; but such failure resulting from an abuse of discretion, or failure to be guided by their deliberate judgment in good faith after due investigation is an actionable wrong if the lessor be damaged thereby.

Third. We hold that the district court erred in sustaining a demurrer to the count

alleging that the "defendants have abused and are abusing their discretion and have arbitrarily refused to drill any additional wells on said land, although they knew * * * that a reasonable development would have required the number of wells to be drilled within the time hereinabove stated," etc. We treated the allegation that the defendants failed to reasonably develop and thereby damaged plaintiff as the second count and the allegations that they knew that reasonable development called for further development and that they arbitrarily and in bad faith declined to proceed further with the development of the property to plaintiff's damage as the third count. We held, and now hold, that the trial court erred in sustaining a demurrer or exception to said third count. Our original opinion sufficiently indicates the allegations constituting this third count.

Otherwise than as here indicated, appellant's motion for rehearing is overruled.